SHILLING *v.* STATE.*

(Division B.    Oct. 11, 1926.)

[109 So. 737.  No. 25788.]

1.  MASTER AND SERVANT.  *To constitute offense of enticing laborer to leave employment, accused must have known of contract (Laws Miss. 1924, chapter 160, amending Code 1906, section 1146 [Hemingway's Code, section 874]; Constitution United States Amendment 13).*

Under chapter 160, Laws of 1924, providing punishment for any person willfully interfering with, enticing away, or who shall knowingly employ, or shall in any manner induce a laborer or renter who has contracted with another person for a specified time to leave his employ or the leased premises, before the expiration of his contract, etc., the defendant must have known of the contract at the time or prior to offering the inducement or hiring; and where the undisputed proof shows that he did

not know of such contract at the time he hired the laborer, he should be acquitted.

.2.   CONSTITUTIONAL LAW. *If statute defining crime is subject to two reasonable constructions, one of which would endanger its constitutionality, construction saving statute will be adopted.*

In construing a statute defining a crime where there are two reasonable constructions, one of which would endanger the constitutionality of the statute, the court will adopt that construction which will save the statute from the constitutional objection.

---

*Corpus Juris-Cyc References:   Constitutional Law, 12CJ, p. 788, n. 1; Master and Servant, 39CJ, p. 1378, n. 57; Liability of third person for inducing a servant to break his contract, see notes in 21 L. R. A. 238; 5 L. R. A. (N. S.) 1091; L. R. A. 1915F, 1076; 7 A. L. R. 306; 15 R. C. L. 48; 3 R. C. L. Supp. 416; General rule as to adoption of construction sustaining constitutionality of statutes, see 25 R. C. L. 1000; 4 R. C. L. Supp. 1615; 5 R. C. L. Supp. 1358.

APPEAL from circuit court of Bolivar county.

HON. W. A. ALCORN, JR., Judge.

J. R. Shilling was convicted of attempting to interfere with, to entice away, and to employ a laborer who had contracted with another, and he appeals. Reversed and judgment rendered.

*Simmons & Jackson,* for appellant.

*In order to be guilty of a violation of chapter* 160, *Laws of* 1924, *which is an amendment of section* 1146, *Code of* 1906, *the defendant must have actual knowledge of the contractual relationship existing between the laborer and the first contractor. Beale* v. *Yazoo Yarn Mill,* 88 So. 411. No crime can be imputed to a man unless there is some criminal intent. None can be charged against Shilling as he had no knowledge of any contract. Then it is evident from the reasoning in the Beale case that if Shilling, in good faith and without any knowledge of any contract between Herrington and the negro James Young, contracted with Young and at-

tempted to move him away, he did not violate the said section in any of its parts.

But the state in the court below urged that by reason of the amendment of the said statute, the rule in the *Beale case, supra,* was abrogated or changed, and that, therefore, it was not incumbent on the state to show actual knowledge on the part of the defendant of the contractual relations between the laborer and the first contractor or prosecutor; that the defendant was presumed to know, or was bound in law to know, of such relation and cannot defend on the ground that he did not know of such relation.

This position on the part of the state in the court below is contrary to the fundamental rule that nothing is presumed against a defendant in a criminal case or action, but that every element of the crime must be not only alleged, but proved beyond a reasonable doubt. The words "knowingly employ" contained in section 1146, Code of 1906, are retained in chapter 160, Laws of 1924. We submit, therefore, that there is nothing in these changes to deprive this defendant of any of the benefits of the rule announced in the *Beale case, supra.*

By way of analogy, the court's attention is called to the statute on False Pretenses, section 893, Hemingway's Code. There is nothing in said section about knowing the representations to be false and it is conceivable that a person might make a false representation with the intent to cheat and defraud, yet believing the representation to be true; but still the courts have required, and certainly it is the rule in this state, that it is incumbent upon the state to show by positive proof that the defendant knew the representations to be false. *State* v. *Freeman,* 103 Miss. 764, 60 So. 774; 11 R. C. L. 859.

*The mere hiring of another who has breached his contract is no violation of the law.* The fact that James Young left Mr. Herrington and went over and made a contract wth Mr. Shilling was no violation of the law

as to Young and none could be imputed to Mr. Shilling.
It is shown by positive proof that Mr. Shilling had no
knowledge of any such prior relationship. *Sneed* v. *Gilman,* 44 So. 830. See, also, *Evans* v. *State,* 83 So. 167;
*Jackson* v. *State,* 16 So. 299; and *Alford* v. *Pegues,* 92
Miss. 558, wherein the rule is stated as follows: "Mere
hiring of another who has breached his contract is no
violation of the law."

This case should be reversed and the defendant discharged.

*Rufus Creekmore,* Special Assistant Attorney-General, for the state.

Counsel argue that the testimony fails to show that
the defendant had knowledge of the existence of the
contract between Young and Herrington and, therefore,
they say that the conviction cannot be sustained, and
rely on *Beale* v. *Yazoo Yarn Mills,* 125 Miss. 807, 88 So.
411. We must remember, however, that the statute
which the court was construing in that case is different
from the statute as it now exists, it having been amended
by the legislature subsequent to the decision of the court
in the Beale case. If the rule of law as laid down by the
Beale case is still in effect, then the contention of appellant must prevail. If, on the other hand, the statute has
been so changed in its wording as to abrogate the rule
in this case, then his contention must fail.

It will be seen that the only changes in the statute are
as follows: The phrase "knowingly employ" is changed
to "who shall knowingly employ," and the phrase "or
induce" is changed to "or who shall in any manner induce."

The change in the wording of the first of these phrases
I deem immaterial as each of them means substantially
the same thing. The change in the wording of the second phrase, however, to my mind, does create a substantially different situation and so completely changes the

meaning of that phrase as to supersede any rule of construction which may have been adopted by the court with reference to the phrase as formerly worded.

This may best be seen by analyzing grammatically the portions of the old statute and the statute as amended which are here involved. Under the old statute the word "wilfully" is an adverb modifying and qualifying the verbs "interfere" and "entice." The word "knowingly" is an adverb which modifies and qualifies the verbs "employ" and "induce." This clearly shows that under the statute before its amendment the offense consisted of the wilful interference with, the wilful enticing away of the servant, or of knowingly employing the servant, or knowingly inducing him to leave his employer. This was what was held in the Beale case and in fact I am unable to see how any other construction could have been placed upon the statute as it was then written.

But when we analyze the statute as it now exists, we find the following: The word "wilfully" modifies the verbs "interfere" and "entice" and in this respect is the same as was the case under the statute before the amendment. The word "knowingly" is the adverb which modifies and qualifies the verb "employ." It is at this point that the change in the wording of the statute as made by the legislature becomes affected.

The next phrase now reads, "or which shall in any manner induce." The word "knowingly" no longer modifies the word "induce." Instead of saying "knowingly induce," the legislature by their act has said that the inducement need not be made knowingly, but has expressly said that "inducements made in any manner" which caused the laborer to leave his employer, constitute a violation of the statute. The words used by the legislature in making this change are clear and unambiguous. They are susceptible of one construction only and that is that they mean what they say.

In this connection we must remember that the theory of the state was not that the defendant employed Young,

but that he induced him to leave his employment. The defendant sent a truck to Young's house, had his household goods loaded on the truck and was actually proceeding to have him move onto his place. It was by this method that the defendant attempted to induce Young to leave the employment of Herrington and he actually would have accomplished his purpose had it not been for the prompt action of Mr. Herrington in stopping the truck.

This was the "inducing" and it was for this that the defendant was tried and convicted; the entire testimony offered by the state was to that effect and it was on that theory that the jury received the case and returned its verdict.

*Simmons & Jackson,* in reply, for appellant.

Counsel for the state admits that the rule in the *Beale case,* 125 Miss. 807, 88 So. 411, is still in effect unless the legislature of 1924 by chapter 160 abrogated it by enlarging the statute by its inclusion of the words, "in any manner induce, etc."

We submit that if the theory of the state is correct, then the ancient rule of criminal intent is completely abrogated. If knowledge of the facts is not an essential element of the offense, then we are treading on dangerous ground. 8 R. C. L. 95; *City of Jackson* v. *Gordon* (Miss.), 80 So. 785.

The legislature never meant to place such a burden on the citizens of this state, so as to require a party who is about to make a contract to first ascertain if the other party interested in making the contract is or is not under a contract with some one else. He can ask him if such relations exist and if he states that there is not, then that certainly should end it. To place this construction on this clause of the statute is not only absurd.

The words "knowingly" and "wilfully" are used in, and color the whole section with reference to enticing

labor, and are to be taken and considered in connection with any crime charged under this section. The rule is that statutes shall be construed favorably to the defendant and strictly as against the state. We, therefore, submit that this case should be reversed and the defendant discharged.

Argued orally by *R. E. Jackson,* for appellant, and *Rufus Creekmore,* Assistant Attorney-General, for the state.

ETHRIDGE, J., delivered the opinion of the court.

The appellant, J. R. Shilling, was prosecuted under an affidavit charging him with unlawfully and willfully attempting to interfere with and entice away and knowingly attempt to employ James Young, a laborer, who had contracted with J. R. Herrington for the months of October and November, 1925, as a cotton picker. The said Jake Shilling did then and there willfully, unlawfully, and knowingly interfere with and attempt to induce said laborer to leave his said employment without the consent and against the will and the wishes of the said J. R. Herrington, his employer, against the peace and dignity of the state. He was convicted in the justice court and appealed therefrom to the circuit court, where a trial was had *de novo.*

The proof before the state was that the prosecutor, Herrington, had in September, 1925, employed one James Young to pick cotton for him. It appears that the arrangement was that Young was to pick cotton for a period of two months, but that no definite time for the beginning or ending of the two months was fixed; that Young did enter upon the service and pick cotton for a time less than two months; that the appellant on being approached by Young, made a contract with him to pick cotton for him, and agreed to move him or have him moved on his place. But Shilling sent another man with

a truck to move Young and his family to his place, and while they were at the place where Young lived on Herrington's farm, loading the truck, Herrington came up and objected, claiming that he had a contract with Young; and, in the conversation at that time, Young claimed that he had not made a contract for a fixed time; that Herrington agreed to take a check to reimburse him for expenses, which Young gave him, and which he deposited and subsequently collected. However, Herrington went and consulted an attorney and returned to the place where the truck had been, and found that it had been loaded and had gone. He followed it and brought it back to his place, and subsequently prosecuted the appellant.

It clearly appears from the testimony that Shilling did not know of the contract between Herrington and Young, whatever the contract may have been. There is no proof by the state that he had any knowledge of such contract; but, on the contrary, the proof showed that Shilling did not know where to send the truck but had to refer the truck driver to the son of Young, who went with and showed him the place. It is further in evidence by the appellant (and his evidence is not disputed) that he asked Young if he was under contract with any other person, and Young stated that he was not; that he had only recently come to the Delta from the Hills, and was a free cotton picker—free to go where he pleased.

It was insisted in the argument, and the court below proceeded upon the theory, that it was immaterial, under chapter 160 of the Laws of 1924, amending section 1146 of the Code of 1906, whether Shilling knew of the contract or not, and that if he did anything which in fact induced the laborer to leave the employment of Herrington he was guilty, regardless of whether he had knowledge of the former contract or not. There being no dispute in the evidence that Shilling did not have knowledge of the contract, the case must stand or fall on the correctness of this contention.

Chapter 160 of the Laws of 1924, omitting the enacting clause, reads as follows:

"That if any person shall willfully interfere with, entice away, or who shall knowingly employ, or who shall in any manner induce a laborer or renter who has contracted with another person for a specified time to leave his employer or the leased premises, before the expiration of his contract without the consent of the employer or landlord in writing signed by said landlord or employer under or with whom said laborer had first contracted, he shall, upon conviction, be fined not less than twenty-five dollars nor more than one hundred dollars, and in addition shall be liable to the employer or landlord for all advances made by him to said renter or laborer by virtue of his contract with said renter or laborer, and for all damages which he may have sustained by reason thereof. The provisions of this section shall apply to minors under contract made by a parent or guardian."

Section 1146 of the Code of 1906 (Hemingway's Code, section 874), reads as follows:

"If any person shall wilfully interfere with, entice away, knowingly employ, or induce a laborer or renter who has contracted with another person for a specified time to leave his employer or the leased premises, before the expiration of his contract without the consent of the employer or landlord, he shall, upon conviction be fined not less than twenty-five dollars nor more than one hundred dollars, and in addition shall be liable to the employer or landlord for all advances made by him to said renter or laborer by virtue of his contract with said renter or laborer, and for all damages which he may have sustained by reason thereof. The provisions of this section shall apply to minors under contract made by a parent or natural guardian."

This section of the Code, which was amended by chapter 160 of the Laws of 1924, was construed in *Beale* v. *Yazoo Yarn Mill,* 125 Miss. 807, 88 So. 411, so as to make the "enticing" willful or knowing; and it was there

held that actual knowledge was required and not mere circumstances that would put a person upon inquiry; that the words of the statute, "shall willfully interfere with, entice away, knowingly employ," mean that the party hiring must have known of the contract at the time of the hiring, and not that he might have known by diligent or reasonable inquiry. The knowledge must exist at the time of the hiring.

It is insisted here that, although the statute is but slightly different in its phraseology, the language of the present statute, "or who shall in any manner induce a laborer or renter who has contracted with another person for specified time to leave his employer or the leased premises, before the expiration of his contract," following the words "if any person shall wilfully interfere with, entice away, or who shall knowingly employ," is to be treated separately from those words, and that any kind of inducement, whether made with knowledge of the first contract or not, would impose the penalty upon the person holding out the inducement.

We think the language of the first part of the statute is substantially the same as it was in the old statute, but that the real amendment in the statute is in that part of the statute which requires the consent of the landlord or employer to be in writing and signed by him. It is familiar learning that statutes will be construed, where their meaning is doubtful, so as to make them harmonious with the Constitution and its provisions, and if the constitutionality of the statute on one construction is doubtful and there is another construction reasonable within itself which will avoid the doubt of its constitutionality, that the court will adopt that construction. This rule was referred to in the *Beale case, supra,* and authorities cited to show the danger of giving the interpretation contended for by the appellee in that case.

In *Bailey* v. *Alabama,* 219 U. S. 219, 31 S. Ct. 146, 55 L. Ed. 191, the court in discussing Bailey's case (Bail-

ey being convicted of violating an Alabama statute) said, at page 240 of 219 U. S., and at page 151 of 31 Sup. Ct., in referring to the Thirteenth Amendment:

"Neither slavery nor involuntary servitude, . . . shall exist within the United States, or any place subject to their jurisdiction. . . . The words 'involuntary servitude' have a 'larger meaning than slavery.'

" 'It was very well understood that, in the form of apprenticeship for long terms, as it had been practiced in the West India Islands, on the abolition of slavery by the English government, or by reducing the slaves to the condition of serfs attached to the plantation, the purpose of the article might have been evaded, if only the word "slavery" had been used.' *Slaughterhouse cases,* 16 Wall, page 69, 21 L. Ed. 406. The plain intention was to abolish slavery of whatever name and form and all its badges and incidents; to render impossible any state of bondage; to make labor free, by prohibiting that control by which the personal service of one man is disposed of or coerced for another's benefit, which is the essence of involuntary servitude."

In the *Civil Rights cases,* 3 S. Ct. 18, at page 29, 109 U. S. 3, 22 (27 L. Ed. 835) it is said:

"The long existence of African slavery in this country gave us very distinct notions of what it was, and what were its necessary incidents. Compulsory service of the slave for the benefit of the master, restraint of his movements except by the master's will, disability to hold property, to make contracts, to have a standing in court, to be a witness against a white person, and such like burdens and incapacities were the inseparable incidents of the institution. Severer punishments for crimes were imposed on the slave than on free persons guilty of the same offenses."

In *Allgeyer* v. *State of Louisiana,* 165 U. S. 578, 589, 17 S. Ct. 427, 431, (41 L. Ed. 832), the court, in speaking of the liberty secured to the citizen by the Fourteenth Amendment, said:

"The 'liberty' mentioned in that amendment means not only the right of the citizen to be free from the mere physical restraint of this person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation; and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned.

"It was said by Mr. Justice BRADLEY, in *Butchers' Union Slaughterhouse Co.* v. *Crescent City Live Stock Landing Co.,* 111 U. S. 746, at page 762, 4 S. Ct. [652] 657 [28 L. Ed. 585], in the course of his concurring opinion in that case, that 'The right to follow any of the common occupations of life is an inalienable right.' It was formulated as such under the phrase 'pursuit of happiness,' in the Declaration of Independence, which commenced with the fundamental proposition that 'all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness. This right is a large ingredient in the civil liberty of the citizen.'

"Again, on page 764, 111 U. S., and on page 658, 4 S. Ct., the learned justice said: 'I hold that the liberty of pursuit—the right to follow any of the ordinary callings of life—is one of the privileges of a citizen of the United States.' And again, on page 765 111 U. S., and on page 658, 4 S. Ct.: 'But if it does not abridge the privileges and immunities of a citizen of the United States to prohibit him from pursuing his chosen calling, and giving to others the exclusive right of pursuing it, it certainly does deprive him (to a certain extent) of his liberty; for it takes from him the freedom of adopting and following the pursuit which he prefers, which, as already intimated, is a material part of the liberty of the

citizen.' It is true these remarks were made in regard to questions of monopoly, but they will describe the rights which are covered by the word 'liberty,' as contained in the Fourteenth Amendment.''

If the statute above set out is construed as contended for, it is difficult to see how it can be upheld, as under the Fourteenth Amendment it is necessary for a man to contract with reference to his business, and it is extremely doubtful as to whether his contract right can be abridged by making him contract at his peril in employing necessary help in the operation of his business, whatever it may be, by imposing liabilities and criminals prosecution that might be utterly destructive of his liberty and his business.

We do not think the legislature intended to penalize a person for making a contract where he acts innocently In our opinion, the inducement must be consciously made; that is, it must be made with the knowledge of the existence of the preceding contract and before it is amended by the laborer. Under the Thirteenth Amendment, it is doubtful whether any statute can be enacted which would have the effect of abridging and destroying the right of a person to abandon employment (subject to civil liability), as such would apparently constitute him an involuntary servant or engaged in servitude against his consent.

The word ''involuntary'' is defined in Bouvier's Law Dictionary as follows:

''An involuntary act is that which is performed with constraint, or with repugnance, or without the will to do it. An action is involuntary which is performed under duress.''

The word ''servitude'' is defined by Bouvier as follows:

''The subjection of one person to another person, or of a person to a thing, or a thing to a person, or of a thing to a thing. A personal servitude is the subjection of one person to another; if it consists in the right of

property which a person exercises over another, it is slavery. When the subjection of one person to another is not slavery, it consists simply in the right of requiring of another what he is bound to do or not to do; this right arises from all kinds of contracts or *quasi*-contracts.''

The principles of the Thirteenth Amendment were adopted as a part of the Bill of Rights of the state Constitution, and the principles of the Thirteenth Amendment were thus approved by the framers of our own Constitution. The Thirteenth Amendment was enacted for the purpose of enabling every person to use his faculties and limbs to his best interest, and it was not contemplated that the wise could induce the simple into the execution of a contract that would be harmful to his welfare or destructive of his liberty and then use the restraining and coercing force of the criminal law to compel its performance by a criminal punishment.

The construction which we place upon the statute seems to be the natural and reasonable one, taking its words and giving them their logical meaning according to the grammatical and rhetorical use of words, and avoids a possible constitutional objection to the statute.

It follows from what we have said that the court should have granted, a peremptory instruction to the appellant, and the judgment of the court below will be reversed, and judgment rendered here discharging the appellant.

*Reversed, and judgment here.*