William John FITZGERALD, Appellant (Defendant below),

v.

The STATE of Wyoming, Appellee (Plaintiff below).

No. 5030.

Supreme Court of Wyoming.

Oct. 30, 1979.

Rehearing Denied Nov. 19, 1979.

Gerald M. Gallivan, Director, Wyoming Defender Aid Program, and Jay D. Schaefer, Student Intern, Wyoming Defender Aid Program, Laramie, for appellant.

John D. Troughton, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Criminal Division; Richard H. Honaker, Asst. Atty. Gen., and Sandra Dunn, Legal Intern, Cheyenne, for appellee.

Before RAPER, C. J., McCLINTOCK, THOMAS and ROSE, JJ., and GUTHRIE, J., Retired.*

ROSE, Justice.

Appellant, William John Fitzgerald, appeals his second-degree murder conviction on three grounds: (1) Inculpatory statements made to the police (in which appellant admitted attacking the victim) were the fruit of an illegal arrest; (2) the appellant was denied a fair trial when the prosecutor made indirect use of a knife which the trial judge ordered suppressed on Fourth Amendment grounds; and (3) the State unfairly surprised the defense with a major prosecution witness. We will affirm.

We will discuss the two Fourth Amendment issues first. The victim's body was found by hunters on the morning of September 22, 1977, in the Lake DeSmet region north of Buffalo, Wyoming. The victim had been cut on the legs, chest and throat. In the course of their investigation, police learned that the victim had last been seen leaving the 21 Club in Buffalo with two young men who were not residents of Buffalo. Composite drawings were made from which police were able to identify the appellant. On September 27, police approached appellant in a restaurant. The State concedes that the police suspicions at that time did not rise to the level of probable cause.

The police asked Fitzgerald if he would talk with them at the Buffalo police station, whereupon he agreed to do this and proceeded with the police to their cars. At the police car, the police asked for permission to search him before allowing him to enter. Appellant volunteered that he had a pocket knife in his pants pocket, whereupon the police confiscated the knife. The group then proceeded to the Buffalo police station. Fitzgerald was there given adequate *Miranda* warnings, after which he made incriminating statements which the police

videotaped. In essence, Fitzgerald told the police that the victim had invited him for a car ride; that they then stopped and appellant began to urinate; that the victim grabbed Fitzgerald's penis, taking Fitzgerald by surprise; and that Fitzgerald, in panic, beat on the victim and then returned to town alone.

Before trial, Fitzgerald's attorney moved to suppress both the knife and the videotaped statements. The trial judge granted the motion to suppress the knife. In his written motion to suppress the statements, and in his oral arguments, Fitzgerald's counsel offered at least three grounds for suppressing the statements: (1) The statements were given involuntarily; (2) the statements were the result of an illegal search; and (3) the statements were the result of an illegal arrest. The trial judge denied the motion to suppress the statements; and, on appeal, Fitzgerald asserts only that the statements were the fruit of an illegal arrest.

Fitzgerald briefed his appeal before publication of the United States Supreme Court decision in *Dunaway v. New York,* —— U.S. ——, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), in which it was held that a person may not be detained for custodial interrogation without probable cause. However, despite the reservation of that question by the United States Supreme Court in *Morales v. New York,* 396 U.S. 102, 90 S.Ct. 291, 24 L.Ed.2d 299 (1969), we are of the opinion that the *Dunaway* holding was completely foreshadowed by Wyoming law. In *Rodarte v. City of Riverton, Wyo.,* 552 P.2d 1245 (1976), we adopted a definition of arrest which unambiguously includes the situation in which a person is involuntarily taken into custody for questioning. Under both *Rodarte* (as supplemented by general Fourth Amendment case law, e. g., *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)) and *Dunaway,* the law is clear: If

---

* ROONEY, J., having recused himself from participation in this case, GUTHRIE, J., Retired, was assigned, having been retained in active judicial service pursuant to Article 5, Section 5, Wyoming Constitution, and Section 5–1–106(f), W.S.1977, by order of this court entered January 1, 1979.

Fitzgerald was taken involuntarily to the Buffalo police station then he had a right, under the facts of this case, to have the statements suppressed despite adequate *Miranda* warnings. The issue which we must consider in this appeal is whether the record supports a finding that Fitzgerald went voluntarily to the police station because, in order for the court to have refused to suppress the questioned evidence, it must be presumed that it found that, according to the facts of record, the defendant left the restaurant with the police of his own free will.

 In considering the record, several observations are in order: (1) Fitzgerald chose not to testify at the suppression hearing; accordingly, the only evidence we have of the transaction is police testimony. (2) The issue of whether or not Fitzgerald went voluntarily to the police station may be resolved by a preponderance-of-the-evidence standard. *Lego v. Twomey,* 404 U.S. 477, 486, 92 S.Ct. 619, 625, 30 L.Ed.2d 618 (1972). See, also, *Lonquest v. State,* Wyo., 495 P.2d 575 (1972). (3) Under our rules of appellate procedure, we view the evidence most favorably to the party who prevailed below. As we said in *Repkie v. State,* Wyo., 583 P.2d 1272, 1273–1274 (1978):

> "An appellate court, in assessing evidence as to its sufficiency, is bound by the following rule:
>
>> " 'In passing upon the sufficiency of the evidence to support a verdict of guilty, an appellate court will not weigh conflicting evidence nor consider the credibility of witnesses; and it must view the evidence in a light most favorable to the prosecution and determine questions of law as to whether there is substantial evidence, direct or circumstantial, or both, which, with the

reasonable inferences that may be drawn therefrom, will sustain the verdict.' *Harris v. State,* Wyo., 487 P.2d 800, 801, citing *United States v. Weiss,* 10 Cir., 431 F.2d 1402, 1407; and *Stock v. Roebling,* Wyo., 459 P.2d 780, 784."

The police testimony is that four police officers approached Fitzgerald in the dining area of the restaurant and explained that they were investigating a local homicide and wished to asked Fitzgerald and his companion a few questions. Fitzgerald said that he had ordered dinner and asked if it would be all right if they ate dinner first. One of the officers replied that he [the policeman] preferred that he [Fitzgerald] come with him down to the police station and that the police would buy his dinner for him later if he wished. The police would not have forced Fitzgerald to accompany them had he refused.[1] Both Fitzgerald and his companion were very cooperative and agreed to accompany the police to the police station. In response to Fitzgerald's questions, he was told that he was not under arrest.[2]

 The trial court could reasonably conclude from the above testimony and surrounding evidentiary circumstances that the defendant left the restaurant voluntarily. When Fitzgerald was approached by the police, he learned that he was under some suspicion. It is, for this court, and we believe was for the trial court, reasonable to infer that a paramount concern of Fitzgerald at that time was to persuade the police of his innocence. True, Fitzgerald could have asserted his rights and told the police not to bother him unless they were prepared to legally arrest him, and such insistence upon his rights could not have been used in evidence against him at trial. E. g., *Irvin v. State,* Wyo., 560 P.2d 372, 372–373 (1977).

1. We do not consider that what the police would have done had Fitzgerald refused to accompany them has a great deal of probative value on the issue of whether or not Fitzgerald voluntarily agreed to go. As we analyze the evidence to determine whether it is sufficient to support the court's judgment of voluntariness, it is Fitzgerald's head that we must look into— not the heads of the policemen. We make the

observation because in *Dunaway,* the United States Supreme Court considered it worth mentioning that the police had decided to "pick up" Dunaway (99 S.Ct. at 2251) and that Dunaway was not free to do anything but accompany the police (99 S.Ct. at 2256).

2. Of course, the courts and not the police must define when an arrest occurs.

In hindsight, this might well have been the better legal strategy. It is even possible to speculate that Fitzgerald may not have known that he had a choice. These possibilities notwithstanding, it is also reasonable to assume that Fitzgerald was aware of his choice and deliberately chose a stance of eager cooperation in the hopes of persuading the police of his innocence.

■ We find no reason in the record to disturb the trial judge's ruling on the motion to suppress the statements. In other words, we find that the record on the issue of whether or not Fitzgerald left the restaurant voluntarily supports the trial court's suppression ruling, which had the effect of holding that he did go voluntarily. Nor do we read the majority opinion in *Dunaway*, supra, to hold that under the facts of this case a finding of involuntariness is required as a matter of law.

We find support for our conclusion here in a recent post-*Dunaway* decision of the Supreme Court of Tennessee, *Childs v. State*, Tenn., 584 S.W.2d 783 (1979).

In *Childs*, the police were investigating a homicide and telephoned the defendant and requested that he visit the police station for questioning. Childs did so but found when he arrived that the investigating officers were not there. Subsequently, the police approached Childs at one of his friend's apartment and asked him to talk to them in their car. Childs agreed. In talking to the police, Childs admitted using a different name. The evidence was that he willingly accompanied officers to his apartment where he produced a driver's license issued in that name. The record goes on to show that Childs then agreed to and did accompany the police to the station house. When the police confronted Childs at the residence of his friend, Childs was merely a potential homicide suspect. Probable cause to arrest Childs did not develop until he was in the station house, at which time he was formally arrested. Childs, like Fitzgerald, did not testify as to the voluntariness of his trip to the police station. In *Childs* the involved police officers testified that the defendant had talked with them voluntarily prior to his arrest and had gone voluntarily with them to the police station. The Tennessee Supreme Court said:

". . . [T]hese are factual issues to be determined from all the circumstances. In the absence of any countervailing evidence whatever, and in view of the fact that both the trial and intermediate appellate courts have accredited the testimony of the police officers, we are unable to sustain the contention of petitioner that his initial questioning, either at the apartment or at the police station, amounted to anything more than general inquiry or investigation or that it constituted an unlawful arrest or illegal detention." 584 S.W.2d at 787.

Appellant's second Fourth Amendment claim is that the prosecutor made indirect use of the knife in his case, despite the fact that the trial judge had ordered the knife suppressed as the result of an illegal search.

During the video-taped interrogation shown at trial, one of the policemen asked the defendant if the knife—which was later suppressed—belonged to the defendant. The defendant replied that it was the knife taken from him. At trial, the description of the victim's body—given by a policeman and a pathologist, and as revealed by photographs—indicated that the victim had sustained knife wounds. We attach no significance to the description of the condition of the victim's body *per se*. The body was discovered by hunters who informed the police. There is no claim that knowledge of the body wounds was obtained by the police in a manner which violated Fitzgerald's rights.

Before trial, the judge met with the two attorneys in chambers to discuss the matter of the references to the knife in the two video-taped interrogations. (Two video-taped interrogations had been made, although only the first was ultimately introduced at trial.) The prosecutor agreed to cut from the second video-taped interrogation all mention of the knife.

The defense attorney declined a similar offer with respect to the first video-taped

interrogation which was introduced. He also declined to have a transcript of the interrogation read, from which would be omitted all reference to the knife. The following conversation was had in chambers among the judge, defense attorney Kirven and prosecutor Goddard:

"MR. KIRVEN: I would rather have the first tape in its entirety as opposed to any editing or that sort of thing or having a transcript of it read. I hope I'm not waiving anything—as between the tape and the prosecutor reading the transcript, I'll go for the tape, and I'm speaking of the first tape.

"THE COURT: Okay, I'll let the first tape in, assuming that a proper foundation is laid for it.

"MR. GODDARD: I don't want to be in a position—I'm willing to erase those portions that have reference to the knife or go with the transcript, so I don't want it to sound like I'm trying to—

"MR. KIRVEN: Well, the fact of the matter is, as far as that transcript goes, the portion that you want to take out of there, if anything is beneficial, they say, 'Did you cut him with your knife,' an obvious reference to the knife, and his answer is, 'No.' That's what they want to cut out.

"MR. GODDARD: Well, I wanted to cut out the references to the knife, but that's fine—

"MR. KIRVEN: I am in no way waiving any additional comment—

"MR. GODDARD: I understand; that's fine.

"THE COURT: Now, as to the second tape, . . . ."

In his brief, appellant claims that at trial an objection was made to the playing of the videotape in its entirety on the grounds that the tape was prejudicial to the defendant. The objection cited to us by appellant was:

"MR. KIRVEN: Your Honor, I would just like to note my objection previously stated to the Court."

Two pages earlier in the transcript, appellant's counsel had made the following objection:

"MR. KIRVEN: We would object, your Honor, to its admission on the grounds previously stated to the Court regarding the voluntaryness [sic] of it and the violation of the defendant's constitutional rights."

The court overruled both objections.

 The record clearly shows that defense counsel, for tactical reasons, declined an opportunity to have reference to the knife deleted from the video-taped statement and that when the video-taped statement was introduced at trial, the defense counsel objected to its admission on other grounds. The law is clear that the right to challenge the admissibility of physical evidence—actually in this case we are dealing with the admissibility of a reference to the physical evidence—may be waived as a tactical choice. E. g., *People v. Esajerre,* 35 N.Y.2d 463, 363 N.Y.S.2d 931, 323 N.E.2d 175 (1974).

Appellant also presses a Sixth Amendment argument on appeal. In the State's case in chief, the defense was "surprised" by the testimony of a former roommate of appellant, Roscoe Lansdown, who testified to four homosexual encounters with appellant, initiated and apparently enjoyed by the latter. Appellant had based his defense on a theory of homosexual panic, which was undermined by Lansdown's testimony. Appellant asserts that the Lansdown testimony was a surprise in violation of an understanding between the two attorneys made before the court at a pretrial discovery hearing. Appellant claims that this unfair surprise deprived him of the right to effectively cross-examine Lansdown.

Before examining in detail the claim of a violated understanding, it is useful to clarify several items:

1. Appellant does not argue on appeal that Lansdown's testimony, introduced during the State's case-in-chief, is substantively offensive under our rules of evidence. (Appellant's trial counsel did not timely object during trial and unsuccessfully raised the issue of plain error in this regard to the

trial judge in a post-verdict motion. Appellant's appellate counsel has apparently abandoned the issue.)

2. As will be explained later, we conclude that the defense was advised that Lansdown was a potential witness. Thus, we see the issue as being whether or not the prosecutor had a duty to advise the defense of the nature of Lansdown's testimony—not as whether the prosecutor had a duty to advise the defense that Lansdown would testify.

3. Appellant does not claim on appeal that the Lansdown testimony was exculpatory to the defendant and thus discoverable under *Brady v. State of Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), or *Jones v. State,* Wyo., 568 P.2d 837 (1977). Nor does appellant claim that under the Wyoming Rules of Criminal Procedure he was entitled to be advised of Lansdown's testimony prior to trial. In fact, statements by prosecution witnesses are discoverable only after the witness has testified at trial. Rule 18(c)(1), W.R.Cr.P.

■ 4. Appellant argues that *United States v. Wade,* 388 U.S. 218, 227, 229–232, 235, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), supports the proposition that uninformed cross-examination is worse than a denial of cross-examination. Indeed, two members of this court in a recent dissent made a somewhat similar observation. *Hayes v. State,* Wyo., 599 P.2d 558 (1979). However, neither constitutional considerations nor the Wyoming Rules of Criminal Procedure require that the prosecution inform the defense in advance of trial of all of the testimony that the prosecution will present. As the United States Supreme Court has said:

" . . . There is no general constitutional right to discovery in a criminal case, and *Brady* [*Brady v. State of Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] did not create one; . . . *Brady* is not implicated here where the only claim is that the State should have revealed that a government informer would present the eyewitness testimony of a particular agent against the defendant at trial." *Weatherford v.*

*Bursey,* 429 U.S. 545, 559–560, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977).

We conclude that the Sixth Amendment right to cross-examination is not violated merely because a counsel is surprised by the testimony of an adverse witness. *Weatherford,* supra. In *Hayes,* supra, the dissent was concerned that the surprise was the result of the defense counsel unwittingly being misled by a court limine order.

With this in mind, let us now examine the pretrial hearing held by the court on the defense's discovery motions.

At the hearing, the two counsel and the judge discussed a defense request for statements from prosecution witnesses. The prosecutor resisted that discovery, stating that he was not withholding any exculpatory material. Both the defense counsel and the judge raised the possibility that material not deemed to be exculpatory by the prosecutor could turn out to be, in fact, exculpatory and thus provide the basis for a mistrial or reversal of the trial court's judgment. At this point the prosecutor responded:

"Well, your Honor, I think at some point—I have tried to be fair about it. I will provide him with a list of all witnesses we intend to call, I have advised him that he can look at any evidence involved in the case, I have advised him that to my knowledge, there is no exonerating material. I'm not sure that the State is required to go beyond what the rules provide."

At this point, the judge asked the prosecutor if he had an open-file policy, to which the prosecutor responded that he did not in all respects have an open-file policy. The judge indicated disapproval. The judge then said he would deny the defense motion for further discovery, with the understanding that if the prosecutor had withheld any exculpatory material a new trial would be granted. The above occurred on October 25, 1977.

After the testimony of Lansdown, the defense counsel moved the trial court for a mistrial on the grounds of unfair surprise.

In argument on the motion, the defense attorney makes the claim that he was provided with a list of prosecution witnesses on March 13, which list did not include the name of Lansdown. The prosecutor emphatically denied this and stated that the March 13 list of possible witnesses which he provided the defense *did* contain the name of Lansdown. The prosecutor further stated that he was not able to contact Lansdown until the 20th of March and did not know until that time what Lansdown's testimony would be. In response to comments by the trial judge and the defense counsel, the prosecutor stated that he was not legally obligated to inform the defense of his new discovery.

Appellant has not produced the March 13 list or in any other way substantiated the claim that the prosecutor excluded Lansdown from the list of witnesses he gave the defense on March 13. The trial judge was confronted by two attorneys giving opposite versions of an agreement between them. In denying the motion for a mistrial, we must assume that he decided the factual issue in favor of the prosecutor. On appeal, we will assume the facts favorable to the party who has prevailed below and not consider conflicting evidence, *Repkie,* supra.

Thus, there remains only the issue of whether the prosecutor was obligated to go beyond the statutory and constitutional requirements and reveal to the defense in advance of trial the substance of Lansdown's testimony. Appellant points to no court order requiring disclosure of the testimony of the prosecution witnesses.

Appellant does, however, rely on the quote of the prosecutor reproduced above. Viewed in the context portrayed above, we do not interpret the prosecutor's statement as a binding promise to inform the defense of all future developments in the prosecutor's preparation of the case. If the defense counsel was surprised by the testimony of Lansdown, we cannot say on the record before us that the surprise was due to unfair activity on the part of the prosecutor or that the defendant did not receive a fair trial.

Affirmed.

McCLINTOCK, Justice, dissenting.

I cannot support this court's independent determination that Fitzgerald voluntarily accompanied the four officers to the police station. He contends that the initial contact constituted an arrest without probable cause. The State concedes that there was no probable cause for arrest but justifies the detention as one for investigative purposes.[1] Most importantly, the record reflects that the trial judge did not consider the question of whether Fitzgerald voluntarily accompanied the officers. He found only that the inculpatory statements were voluntarily made. Notwithstanding this omission, this court avoids application of principles pertaining to search and seizure that are well established by decisions of the Federal Supreme Court,[2] as well as our own court,[3] by resorting to a "presumption" that

1. The question of whether the police officers may justify their detention of a person on the basis that it was for investigatory purposes appears to me to be disposed of in *Dunaway v. New York,* —— U.S. ——, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). The opinion of the court does not appear to accept this argument so I see no need for further discussion of the point.

2. These cases include *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1967); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Dunaway v. New York,* supra n. 1; and *Brown v. Texas,* —— U.S. ——, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979);

as well as our own decision in *Rodarte v. Town of Riverton,* Wyo., 552 P.2d 1245 (1976). In *Terry v. Ohio,* supra, 392 U.S. at 16, 88 S.Ct. at 1877, we find this much-quoted statement: "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Section 210.1 of the Official Draft No. 1 of A Model Code of Pre-Arraignment Procedure defines "seizure" as "the taking of any person or thing *or the obtaining of information* by an officer pursuant to a *search or under color of authority."* (Emphasis added.)

3. *Rodarte v. Town of Riverton,* supra n. 2, 552 P.2d at 1250. This case deals with an arrest, and I quote in part from our definition: " 'An

the trial court found that Fitzgerald accompanied the officers of his own free will.

In *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968), the United States Supreme Court made the following observation concerning Fourth-Amendment rights:

" 'No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.' *Union Pac. R. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891)."

In *Dunaway v. New York,* —— U.S. ——, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), a case which I consider most pertinent to the disposition of the case at bar, the Court carefully and exhaustively considered the question of the legality of custodial questioning on less than probable cause. The Court stated:

"[D]etention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." —— U.S. at ——, 99 S.Ct. at 2258.

In that case the county court as well as the Supreme Court of the United States found that *Dunaway* had been "seized." —— U.S. at ——, 99 S.Ct. at 2252, 2253, 60 L.Ed.2d at 830, 831. This court distinguishes *Dunaway* on the issue of voluntari-ness, supporting that distinction by its own finding that Fitzgerald's appearance at the Buffalo police station was voluntary.[4] However, I must point out that the factual situation of the two cases is virtually identical, except for what was in the mind of the officer, an attitude which this court expressly recognizes as not determinative of the question.[5] I therefore consider the decision authoritative in the case before us.

In *Dunaway,* three detectives of the Rochester police force located Dunaway at a neighbor's house and requested that he accompany them to the local police station for questioning. He agreed and was transported to the police station in a patrol car. After arriving at the police station he was not "booked" but was placed in an interrogation room. While he was not placed under arrest, neither was he told that he could leave at any time. Officers testified that he would have been restrained from leaving had he attempted to do so.

In the case at bar Fitzgerald and a companion were having a drink at the Crossroads Inn, preliminary to eating dinner which they had ordered. They were approached by two agents of the Wyoming Division of Criminal Investigation and two Buffalo police officers. D.C.I. Agent Duggan told the two men that he desired to speak to them about a murder investigation, and asked if they would accompany the officers to the police station for this purpose. Although the court postulates that Fitzgerald "chose a stance of eager cooperation" when he was asked to talk to the officers, Fitzgerald's initial response

---

arrest is the taking, seizing, or detaining of the person of another, * * * (2) or by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest * * *.' "

**4.** In *Mollett v. City of Tacoma,* 53 Wash.2d 729, 337 P.2d 48, 49 (1959) it is said: "Webster's International Dictionary defines 'involuntary' as 'Not proceeding from choice; done, given, etc., unwillingly or under compulsion; * *.' " *Shilling v. State,* 143 Miss. 709, 109 So. 737, 739 (1926) refers to Bouvier's Law Dictionary: " 'An involuntary act is that which is performed with constraint, or with repugnance, or

without the will to do it. An action is involuntary which is performed under duress.' "

**5.** "We do not consider that what the police would have done had Fitzgerald refused to accompany them has a great deal of probative value on the issue of whether or not Fitzgerald voluntarily agreed to go. As we analyze the evidence to determine whether it is sufficient to support the court's judgment of voluntariness, it is Fitzgerald's head that we must look into— not the heads of the policemen." *Ante,* n. 1. I object to this statement only as it assumes without basis in the record that the trial court expressed a judgment of voluntariness on this issue of the case.

was to ask if he could finish his dinner. Agent Duggan told Fitzgerald that he wished to talk with the men immediately, and offered to buy their dinner after the interview. Neither of the men was told that he did not have to accompany the four officers, nor was either at that time told that he was not under arrest. Duggan testified that on the way to the officers' car Fitzgerald asked if he was under arrest and Duggan replied that he was not. Duggan further testified that he would have let the men go had they refused to accompany him to the station. This feeling was not communicated to either of the two men.

The two situations track one another except in one respect. In *Dunaway* the officers had the mental attitude, not expressed to the defendant, that they would have restrained defendant had he attempted to leave. In the case at bar the principal officer had the mental attitude, not expressed to Fitzgerald, that he would not have restrained him had he attempted to leave.[6]

I agree with my Brothers that "it is Fitzgerald's head that we must look into—not the heads of the policemen." Since the trial judge never reached the Fourth-Amendment issue of whether Fitzgerald voluntarily consented to accompany the police, Fitzgerald's attitude concerning the "request" remains the unsettled question in the case. But rather than remanding the case for a properly focused, factual determination on the issue of the voluntariness of the detention, this court assumes that Fitzgerald was aware of the fact that he was not obligated to accompany the police. They further speculate that Fitzgerald may have accompanied the police in hopes of persuading the police of his innocence. This hardly seems a reasonable base for the court's holding that the trial court "could reasonably conclude * * * that defendant left the restaurant voluntarily."

As I have already indicated, to me *Dunaway* is indistinguishable in its facts. In another state case, *Commonwealth v. Daniels,* 455 Pa. 552, 317 A.2d 237, 239 (1974),[7] the initial police contact with Daniels was almost identical to the present case. Daniels and his girlfriend were in the process of preparing dinner when the police came to the door and requested that Daniels accompany them to headquarters for questioning concerning a murder. The officer testified that Daniels was not given time to finish cooking his dinner. In light of this fact, the Supreme Court of Pennsylvania stated that "[t]o us, this indicates that appellant was subject to the will of the officers."

To the same effect is the Commentary on Art. 110, A.L.I., A Model Code of Pre-Arraignment Procedure, Proposed Official Draft No. 1, § 110.1 (1972):

"The motives that lead one to cooperate with the police are various. To put an extreme case, the police may in purely precatory language request a person to give information. Even if he is guilty, such a person might accede to the request because he has been trained to submit to the wishes of persons in authority, or because he fears that a refusal will focus suspicion, or because he believes that concealment is no longer possible and a cooperative posture tactically or psychologically preferable. *Regardless of the particular motive, the cooperation is*

---

**6.** See n. 5, supra.

**7.** After remand a hearing was held on motion to suppress. The State filed a stipulation that the identities of certain witnesses had been obtained as a result of the statement which the Supreme Court had suppressed (317 A.2d 237). The Supreme Court first held that the testimony of these witnesses did not represent the fruit of the poisonous tree and at first sustained admission thereof. However, a supplemental opinion was then issued remanding the case to the trial court for an evidentiary hearing and determination whether the stipulation was val-

id and enforceable. *Commonwealth v. Daniels,* 470 Pa. 523, 368 A.2d 1279, 1284 (1975). On remand the trial court entered an order setting aside the stipulation and this action was affirmed and the cause remanded for new trial as ordered in the first Supreme Court opinion, *Commonwealth v. Daniels,* 479 Pa. 114, 387 A.2d 861 (1978). As I read this history, it leaves in effect the Supreme Court's determination that Daniels' confession had been obtained as the result of the illegal arrest, but permitted the other evidence to come in.

*clearly a response to the authority of the police.*" (Emphasis added.)

In the present case Fitzgerald asked the officer if he could finish his dinner. Duggan testified that Fitzgerald

"was quite cooperative, but he seemed nervous and apprehensive initially. * * Mr. Fitzgerald raised the issue if they could stay for dinner, and I was afraid to leave him there."

While Duggan denied that this fear was an indication that Fitzgerald was not free to leave, this has *no bearing on Fitzgerald's* state of mind.

Gerald H. Abrams, writing on Constitutional Limitations on Detention for Investigation, 52 Ia.Law Rev. 1093, 1104, poses this problem:

"Several detention for investigation situations raise difficult problems as to whether there is a restraint of freedom. Consider, for example, the case of a policeman who approaches a citizen who is walking on a public sidewalk. The policeman does not announce any coercive order, but his uniform and inherent authority will surely affect the individual. The citizen may feel entirely free and willing to stop and answer questions. Thus, should the citizen stop, it would be difficult to discern whether the "stop" was coerced or volunteered. *This is, and should be, a question for the trier of the facts.*" (Emphasis added.)

I ask, what would the ordinary citizen do when suddenly confronted with four police officers, representing the full majesty of the law, who "request" him to come to the police station for questioning about a murder? When considering such a question and making a factual determination of voluntariness, a court must consider the vulnerability of the person to psychological coercion and also " 'the possibility of "subtly coercive police questions." ' " *Whitman v. State,* 25 Md.App. 428, 336 A.2d 515, 529 (1975), quoting from *Schneckloth v. Bustamonte,* 412 U.S. 218, 229, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). As the Maryland Court stated, quoting from *United States v. Rothman,* 6th Cir., 492 F.2d 1260, 1265 (1973),

" ' * * * [t]he psychological atmosphere in which the consent is obtained is a critical factor in the determination of voluntariness.' " 336 A.2d at 529.

Although Fitzgerald eventually agreed to accompany the four officers, I cannot agree that his consent was freely given.

*Lego v. Twomey,* 404 U.S. 477, 486, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), a Fifth-Amendment case, is cited to support the court's conclusion that "[t]he issue of whether or not Fitzgerald went voluntarily to the police station may be resolved by a preponderance-of-the-evidence standard." More pertinent to our inquiry concerning Fourth-Amendment rights are these statements from *Judd v. United States,* 89 U.S. App.D.C. 64, 65–66, 190 F.2d 649, 650–651 (1951):

"Searches and seizures made without a proper warrant are generally to be regarded as unreasonable and violative of the Fourth Amendment. True, the obtaining of the warrant may on occasion be waived by the individual; he may give his consent to the search and seizure. But such a waiver or consent must be proved by clear and positive testimony, and it must be established that there was no duress or coercion, actual or implied.",

and from *Bumper v. State of North Carolina,* 391 U.S. 543, 548–549, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968):

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority."

The applicable principles are summarized by a federal district court in *United States v. Roche,* 36 F.R.D. 413, 414–415 (D.C.Conn. 1965):

"Mindful of the necessity to preserve those fundamental safeguards requisite for a free society, courts indulge every reasonable presumption against waiver of basic constitutional rights. *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82

L.Ed. 1461 (1938). Thus the government has the burden to prove by clear and positive evidence that the consent to the search was *unequivocal and voluntary, free from duress or coercion. United States v. Mitchell,* 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944); *United States v. Rivera,* 321 F.2d 704 (2 Cir. 1963); *United States v. Smith,* 308 F.2d 657 (2 Cir. 1962), cert. denied, 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716. No precise rules capable of automatic application are available. However, it is now generally accepted that courts will view with disapprobation claims of waiver when the consent to search 'was granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right.' *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). Some cases hold that, except in extraordinary circumstances, consent to a search after officers of the law have identified themselves or after the defendant is placed under arrest is not a voluntary consent, because it is not in accord with common experience and can only be explained by physical or mental coercion. *Judd v. United States,* 89 U.S.App.D.C. 64, 190 F.2d 649 (1951); *Higgins v. United States,* 93 U.S.App.D.C. 340, 209 F.2d 819 (1954); *United States ex rel. Holloway v. Reincke,* 229 F.Supp. 132 (D.C. Conn.1964); *United States v. Gregory,* 204 F.Supp. 884 (S.D.N.Y.1962). A review of these cases and similar cases which hold that voluntary consent had not been given, indicates the defendants, although verbalizing a consent to search, were in actuality submitting or acquiescing in an orderly way to the police officials' power and influence." (Emphasis added.)

I also cannot agree that the present case must be disposed of according to the appellate rule that "we view the evidence most favorably to the party who prevailed below." When an appellate court is faced with a constitutional issue it is

" * * * required to examine the entire record and to make an independent, reflective constitutional judgment on the facts. *Davis v. North Carolina,* 384 U.S. 737, 741, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); *Walker v. State,* 12 Md.App. 684, 280 A.2d 260 (1971)." *Whitman v. State,* 25 Md.App. 428, 336 A.2d 515, 519 (1975).

*Childs v. State of Tennessee,* Tenn., 584 S.W.2d 783 (1979) is cited as concurring authority for the view that Fitzgerald did voluntarily accompany the officers. Childs' first appearance at the police station was in response to a telephone call merely asking if he could come down and talk. He did go to the police station, without police escort of any kind, but was unable to contact the officers who were involved. They subsequently contacted him where he lived and there is every indication that subsequent interviews were on an equally voluntary basis. However, the significant difference is that it was only after a factual hearing and decision by the trial court, unequivocally directed to the question of voluntariness, affirmed by the Court of Criminal Appeals, that the Supreme Court of Tennessee approved the conviction. This is consistent with the principle announced in *Davis v. North Carolina,* supra, cited in *Whitman v. State,* supra, 336 A.2d at 519. However, in making such a review the appellate court should not ignore the trial court's independent, reflective judgment of the facts. Such a procedure has not been followed in this case and there has been no independent, reflective decision by the trial court upon the factual question. Nevertheless, this court speaks to what the trial court *could* have found, not what it did find. It is contrary to the philosophy of appellate practice to affirm on the basis of what the trier of fact *might* have found.

I would remand the case to the district court for a full evidentiary hearing so that the trial court could render an informed decision as to whether Fitzgerald voluntarily accompanied the officers. In *Dunaway* the United States Supreme Court first vacated the lower court judgment and remanded the case to the New York Court of Appeals for further consideration in light of *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). *Dunaway v.*

*New York,* 422 U.S. 1053, 95 S.Ct. 2674, 45 L.Ed.2d 705 (1975). In a memorandum decision remanding the case to the Monroe County Court for a factual determination, the Court of Appeals referred to the motion to suppress and pointed out that the trial court had ruled

"* * * only that the statements were voluntarily given after proper *Miranda* warnings and therefore were not excludable on *Miranda* grounds. The Appellate Division affirmed that decision without opinion (42 A.D.2d 689, 346 N.Y.S.2d 779). "Specifically, no findings were made as to the nature of the detention, if that it was, and, if it was, whether there was probable cause for the detention * * *. Accordingly, this case must be remitted to the Monroe County Court for a factual hearing and such other proceedings as may be necessary to determine the issues * * *." *People v. Dunaway,* 38 N.Y.2d 812, 382 N.Y.S.2d 40, 345 N.E.2d 583 (1975).

The finding of the trial judge in the case at bar was identical to the first holding of the trial judge in *Dunaway.* The trial judge in our case never considered whether Fitzgerald accompanied the police voluntarily, nor did Fitzgerald take the stand to describe his reaction to the officer's request. The trial judge considered that defendant's statements were admissible only because proper *Miranda* warnings were given and ignored the Fourth-Amendment question whether defendant voluntarily accompanied the officers to the police station. As expressed by counsel at the suppression hearing, the basis of the motion to suppress was that

"* * * defendant was illegally brought into custody without probable cause therefor, and that the statement which was given was the product of an illegal search * * *."

He also argued that there had been no knowing and intelligent waiver and that the statement was not voluntary. In the course of the argument the trial judge made this observation:

"* * * As I understand your motion, it goes to the basis of the thing, that it was not an informed statement or that it was not one in the absence of coercion or undue influence,"

to which defense counsel replied:

"My view, your Honor, was just to challenge it on a constitutional basis and then if it's admitted or whatever, we may have to take further steps. * * * Well, your Honor, the burden on the prosecution is to show that the statements were made voluntarily.

"THE COURT: Yes, that's all we are discussing here today.

* * * * * *

"THE COURT: The motion will be denied as to the statements, one on September 27th and one on September 29th, *as to the point we were here today, as to whether or not they were voluntary statements.*" (Emphasis added.)

This court has consistently emphasized the importance of initial decisions by the trial court on questions of fact. As we have stated, "[i]t is not [the court's] function to determine the facts and the law in a case in the first instance. That must be done by the trial court." *Buckman v. United Mine Workers of America,* 80 Wyo. 199, 213, 339 P.2d 398, 402, reh. denied 342 P.2d 236 (1959). "[W]e prefer not to decide questions of this kind until they have first been decided by the trial court," *Tranel v. Gilkey,* Wyo., 524 P.2d 580, 584 (1974), and we will not "substitute our judgment for that of the trial court on a question of fact." *Tri-State Oil Tool Industries, Inc. v. EMC Energies, Inc.,* Wyo., 561 P.2d 714, 717 (1977). Furthermore,

"[i]t is the rule 'that where the evidence justified either of two reasonable inferences, one favorable to the party having the burden of proof and the other favorable to his opponent, the trier of the facts should be allowed to determine which, if either, of the two inferences is more reasonable or probable, and make his finding accordingly. * * *' *White v. Maverick Production Co.,* 63 Wyo. 452, 182 P.2d 818, 822." *Bocek v. City of Sheridan,* Wyo., 432 P.2d 893, 895 (1967).

However, in this case this court has not allowed the district court to make the initial determination.

While I would not at this stage of the proceedings reverse and require a new trial without use of the inculpatory statements, I would vacate the conviction and remand the cause for further proceedings to determine if Fitzgerald voluntarily submitted to detention and interrogation. Should the trial court conclude that defendant did voluntarily accompany the police, the conviction would be reinstated subject to the usual review by this court. If it found no such voluntary conduct, a new trial without use of the statements would be required.[8]

---

**8.** Such action on the part of an appellate court is not unusual, as witnessed by the proceedings in *Dunaway.* In other cases before the United States Supreme Court a similar procedure has been followed. For example, in *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) the Supreme Court found that defendant had been denied counsel at preliminary hearing but remanded the case to the state court for a determination whether such denial of counsel was harmless error. See also, *Hoffa v. United States,* 387 U.S. 231, 234, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967); *Kolod v. United States,* 390 U.S. 136, 88 S.Ct. 752, 19 L.Ed.2d 962 (1968); *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176, reh. den. 394 U.S. 939, 89 S.Ct. 1177, 22 L.Ed.2d 475 (1969).