Dennis Randolph PARKHURST and Derrick Raymond Parkhurst, Appellants (Defendants),

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 5299.

Supreme Court of Wyoming.

June 3, 1981.

Michael H. Schilling, Appellate Counsel, Wyoming Public Defender Program, Laramie, signed the brief and appeared in oral argument on behalf of the appellants.

John D. Troughton, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Criminal Division, and Allen C. Johnson, Senior Asst. Atty. Gen., signed the brief of appellee. Allen C. Johnson, Sr. Asst. Atty. Gen., appeared in oral argument.

Before ROSE, C. J. *, McCLINTOCK **, RAPER ***, THOMAS and ROONEY, JJ.

RAPER, Justice.

Appellants were tried by a jury and convicted of first degree murder and assault and battery with felonious intent. They challenge the conviction on three bases. First, they argue that their constitutional rights were violated when police officers stopped their vehicle without probable cause, and that therefore all evidence obtained as the result should have been suppressed. Second, they contend that the consent they gave to a search of their vehi-

---

\* Chief Justice since January 5, 1981.

\*\* Retired March 26, 1981, but continued to participate in the decision of the court in this case

pursuant to order of the court entered March 30, 1981.

\*\*\* Chief Justice at time of oral argument.

cle's trunk was obtained illegally and that, therefore, it was invalid, thus mandating the suppression of the evidence gathered during the search. Finally, they claimed that certain testimony by the arresting officer was impermissible comment upon the exercise of the appellants' constitutionally protected right of silence.

We will affirm.

At approximately 11:45 p. m. on October 29, 1978, the home of Dennis and Christina Baird, located in Glenrock, Wyoming, was entered by force. The assailants kicked open the front door and went inside. Wade Dugger, a house guest who was sleeping in the front room on a couch, awoke to the sound of a shotgun blast which hit the Bairds' dog as it ran into the room. Mr. Dugger stood up and he too was shot. The blast knocked him backwards into the adjoining bedroom in which the Baird children were sleeping. Dennis and Christina Baird jumped out of bed to investigate the commotion. As they approached the door into the front room, Dennis pushed his wife back into the bedroom and indicated that she should wait. He then went around the door and was instantly shot. His body, recoiling from the shotgun blast, landed at Christina's feet. Desperate for help, she headed out of the bedroom and then saw Derrick Parkhurst, one of the appellants, running out the front door.[1] When she went to check on her children, she discovered that Mr. Dugger was seriously injured. She asked if he was all right and he responded, "no," and then said, "Derrick." Ms. Baird then ran next door for help.

When the police arrived, a witness told them that he had seen two males fleeing the scene in a blue or green Ford Fairlane and that he had followed the car far enough to see it heading out of town towards Douglas, Wyoming. The police, upon entering the house, determined that Dennis Baird was dead but that Wade Dugger was still alive. While awaiting the arrival of an ambulance, Ms. Baird informed the police that Dennis and Derrick Parkhurst were

the assailants. A police officer then asked Mr. Dugger if he knew who shot him. Unable to understand the response, the officer queried if it had been Derrick and Mr. Dugger indicated yes; Dugger survived to testify.

The Glenrock Police Department alerted the sheriff's office, which in turn broadcast a description of the two assailants' car.[2] The broadcast also noted that the vehicle was last seen heading north out of Glenrock on a back road leading to Douglas. The sheriff's office in Douglas dispatched Officer Hineman to patrol the back road from Glenrock at the point it leads into Douglas. Officer Hineman, while on patrol, saw a mid-60's vehicle going into Douglas at about a quarter to one, a. m. In order to get a better look, the officer made a U-turn and followed the car. He was then able to determine that the car was a blue Dodge with a license number of 8–4679, and that the car had two occupants. As the officer followed the vehicle onto an entrance ramp for I-25, he contacted City of Douglas Officer Dekmar, who was stationed on that highway, informed him of his intent to stop the suspects, and asked for backup.

When the stop was made by Officer Hineman, he positioned his car so that the car's headlights would shine on him as he approached the suspects' vehicle. As Officer Dekmar pulled up behind Officer Hineman's patrol car, he saw Officer Hineman walking towards the suspects' car. Dekmar then exited his vehicle and crossed over to the guardrail running parallel to the highway. Taking up a position there where he could observe Hineman and the subjects, he drew his weapon. Hineman, meanwhile, asked the driver for his license which when produced identified him as Dennis Parkhurst. The subject was then requested to get out of the car and stand in front of it with his hands on the hood. The officer was informed that the passenger was Derrick Parkhurst. Derrick was asked to also exit the vehicle and position himself in

1. Numerous lights had been left on throughout the house enabling Ms. Baird to recognize the appellant, whom she knew quite well.

2. Originally, the vehicle was described as a " '68 red Ford Fairlane," but the description was subsequently corrected.

front of it. While doing so, he observed Officer Dekmar by the guardrail with his gun drawn. At this point, Officer Hineman questioned the suspects concerning their whereabouts prior to the stop. When Hineman walked back to his vehicle to radio the dispatcher, Dekmar holstered his gun and approached the suspects to determine if they had any weapons. When asked, Derrick indicated that there was a .22 and a shotgun in the trunk. Dekmar then tried to contact the county attorney by radio. Unable to, he returned to ask the suspects who owned the car. Dennis Parkhurst stated that he did. Dekmar requested permission to search the car. Dennis' reply was that he was no lawyer, but Derrick told him to go ahead and let the police search the car. Dekmar advised Dennis he did not have to be a lawyer and that he could either grant permission for the search or he could refuse. Finally, Dennis consented. The police then retrieved the keys from Dennis' pocket and conducted the search. In the trunk they found a .22 caliber rifle and 12-gauge shotgun which was later matched to the spent shells found at the scene of the murder. From the smell of the shotgun, it was determined that it had recently been fired. Hineman then advised both subjects they were under arrest. Officer Dekmar gave the appellants their *Miranda* rights as he patted them down and handcuffed them.

While the guns were removed from their auto and it was impounded, the Parkhursts were taken in and booked.

Appellants sought before trial to have all evidence obtained as a result of the stop as well as the search suppressed on the basis of the unconstitutionality of the police officers' conduct. However, the trial judge denied their motion and admitted the evidence. Now on appeal the trial judge's ruling is challenged partly upon grounds emanating from the Fourth Amendment to the United States Constitution[3] and § 4, Art. I of the Wyoming Constitution[4] and partly upon grounds emanating from the Fifth Amendment to the United States Constitution[5] and § 11, Art. I of the Wyoming Constitution.[6] We shall consider the former grounds first.

I

The appellants' Fourth Amendment claim is directed to the seizure of their persons and the search of the automobile in which they were riding. The remedy they seek for the alleged violation of their rights is the invocation of the exclusionary rule barring the admission of all evidence obtained as a result of illegal police activity.

▮ First, in order to assert a constitutional violation, one must have standing.

3. Fourth Amendment, United States Constitution:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

4. Section 4, Art. I, Wyoming Constitution:

"The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by affidavit, particularly describing the place to be searched or the person or thing to be seized."

5. Fifth Amendment, United States Constitution:

"No person shall be held to answer for a capital, or otherwise infamous crime, unless

on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall he be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

6. Section 11, Art. I, Wyoming Constitution:

"No person shall be compelled to testify against himself in any criminal case, nor shall any person be twice put in jeopardy for the same offense. If a jury disagree, or if the judgment be arrested after a verdict, or if the judgment be reversed for error in law, the accused shall not be deemed to have been in jeopardy."

This issue was considered by the United States Supreme Court in connection with the Fourth Amendment in *Rakas v. Illinois*, 1978, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387, reh. denied 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 83. There the Court concluded in order to obtain the benefit of the remedy, i. e. the exclusionary rule, an individual must first demonstrate that his legitimate expectation of privacy in that which was either searched or seized was violated. *Katz v. United States*, 1967, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576. See also Comment, Unreasonable Searches Under the Fourth Amendment: "the rule becomes 'curiouser and curiouser,'" 15 Land & Water L.Rev. 275 (1980). This is the first opportunity this court has had to consider this issue following *Rakas*. We agree that one seeking the imposition of the exclusionary rule must be claiming a violation of his/her own constitutional rights under the Fourth Amendment, United States Constitution, or § 4, Art. I, Wyoming Constitution. And where the accusation is that the police have improperly searched or seized something, the claimant must have had a legitimate expectation of privacy as to that something. Factors to be considered in making this determination include: (1) the precautions taken in order to maintain one's privacy; (2) the likely intent of the drafters of the United States and Wyoming Constitutions; (3) the property rights the claimant possessed in the invaded area; (4) the legitimacy of the individual's possession of or presence in the property which was searched or seized. Comment, supra, 15 Land & Water L.Rev. at 283, fn. 56,[7] and at 295.

▮▮▮ In this case, we must conclude that the appellants did possess the requisite expectation of privacy. No one has ever challenged the existence of such in regard to one's own person, and properly so; therefore, appellants have standing to object to the seizure of their persons. Further, Dennis Parkhurst as owner of the vehicle which was searched had a legitimate expectation of privacy in his property, as would all property owners. And we find that Derrick Parkhurst as a guest in his brother's automobile could reasonably expect that the car in which he was a guest would be free from state encroachment. Thus, both appellants have standing to protest the search of the car's trunk under § 4, Art. I of the Wyoming Constitution.

Appellants assert that their constitutional rights were violated when they were stopped and detained by the police officers and then again when the trunk of the automobile in which they had been riding was searched. Based upon these claims, they ask this court to overturn their convictions because the trial court failed to exclude the evidence found as a result of the police misconduct.

The purpose of the Fourth Amendment guarantees has been eloquently expounded upon by the United States Supreme Court on numerous occasions. In *Weeks v. United States*, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, it was stated:

> "* * * If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution. The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land. * * * " 232 U.S. at 393, 34 S.Ct. at 344, 58 L.Ed. at 656.

In the years that followed, the Court has continued to discuss the Fourth Amend-

---

7. The Comment's author observed that there was some confusion over the intent of Justice Rehnquist. However, we are of the opinion that under § 4, Art. I, Wyoming Constitution, the individual's legitimate presence on or possession of the seized property will establish a legitimate expectation of privacy. And this is just plain common sense because a guest in a home or automobile will in fact expect to be secure from outside intrusion by either the public at large or the state.

ment as embodying the democratic principles which are the cornerstone of our Constitution. Cann & Egbert, The Exclusionary Rule: Its Necessity in Constitutional Democracy, 23 Howard Law Journal 299 (1980). Justice Sutherland, writing for the majority in *Byars v. United States*, 1927, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520, noted:

" * * * The Fourth Amendment was adopted in view of long misuse of power in the matter of searches and seizures both in England and the colonies; and the assurance against any revival of it, so carefully embodied in the fundamental law, is not to be impaired by judicial sanction of equivocal methods, which, regarded superficially, may seem to escape the challenge of illegality but which, in reality, strike at the substance of the constitutional right." 273 U.S. at 33–34, 47 S.Ct. at 250, 71 L.Ed.2d at 524.

Justice Butler's majority opinion in *Go-Bart Importing Company v. United States*, 1931, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374, observed:

" * * * Since before the creation of our government, [general] searches have been deemed obnoxious to fundamental principles of liberty. They are denounced in the constitutions or statutes of every State in the Union. *Agnello v. United States*, 269 U.S. 20, 33 [46 S.Ct. 4, 6, 70 L.Ed. 145]. The need of protection against them is attested alike by history and present conditions. The Amendment is to be liberally construed and all owe the duty of vigilance for its effective enforcement lest there shall be impairment of the rights for the protection of which it was adopted. [Citations.]" 282 U.S. at 357, 51 S.Ct. at 158, 75 L.Ed. at 382. (Bracketed word substituted.)

And Justice Jackson in his majority opinion in *Johnson v. United States*, 1948, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436, stated:

" * * * An officer gaining access to private living quarters under color of his office and of the law which he personifies must then have some valid basis in law for the intrusion. Any other rule would undermine 'the right of the people to be secure in their persons, houses, papers, and effects,' and would obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law." (Footnote omitted.) 333 U.S. at 17, 68 S.Ct. at 370–371, 92 L.Ed. at 442.

In *Terry v. Ohio*, 1968, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, the Supreme Court established that it was constitutionally permissible for police to stop and frisk an individual when the officer had a reasonably articulable suspicion that the person was armed and dangerous. The opinion reached this result because such a detention was not nearly so intrusive as a full-blown arrest and, therefore, could be justified on less grounds, i. e., probable cause was not required. Also see, *United States v. Cortez*, 1981, —— U.S. ——, 101 S.Ct. 690, 66 L.Ed.2d 621.

The Tenth Circuit has expounded further on the subject in *United States v. Sanchez*, 10th Cir. 1971, 450 F.2d 525, 528:

"Temporary detention for limited investigatory purposes, as well as a full blown arrest, is protected by the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, in *Terry* it was observed that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest, and that the test of any governmental invasion of a citizen's personal security is its reasonableness in the light of all the surrounding circumstances.

"In this same vein it has been held that probable cause to arrest requires something more than probable cause to temporarily detain for the purpose of attempting, for example, some on-the-spot questioning and that, as concerns the latter, brief detention under circumstances that would not justify an arrest is not ipso facto unconstitutional. See such cases as *Wilson v. Porter*, 361 F.2d 412 (9th Cir. 1966); *United States v. Unverzagt*, 424

F.2d 396 (8th Cir. 1970); and *United States v. Oswald*, 441 F.2d 44 (9th Cir. 1971). And in *United States v. Harflinger*, 436 F.2d 928 (8th Cir. 1970), cert. denied, 402 U.S. 973, 91 S.Ct. 1660, 29 L.Ed.2d 137, it was held that a brief detention based on an officer's reasonable suspicion that criminal activity was afoot is constitutionally permissible for the purposes of a limited inquiry and that incriminating evidence which may come to the officer's attention during such period of detention can become a reasonable basis for effecting a valid arrest."

Wyoming approved this language from *Sanchez* when after the following passage the preceding was quoted in a footnote:

"This does not mean that a person may not be detained by the officer for investigation without an arrest being effected where there is probable cause to believe there has been a crime committed or to believe one is being committed, coupled with a belief that the subject is or could be involved in its commission. Under such probable cause circumstances the person may be detained for inquiry." (Footnote omitted.) *Rodarte v. City of Riverton*, Wyo.1976, 552 P.2d 1245, 1251.

*Sanchez* has continued in effect in the Tenth Circuit. In *United States v. Nevarez-Alcantar*, 10th Cir. 1974, 495 F.2d 678, the court stated:

" * * * It is fundamental that 'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.' *Terry v. Ohio*, supra, at p. 22, 88 S.Ct. at p. 1880. And, under appropriate circumstances, police officers have a duty to approach, temporarily detain and question persons as to possible crimes, and investigate suspicious behavior, even though there are insufficient grounds for arrest. *United States v. Saldana*, 453 F.2d 352 (10th Cir. 1972); *United States v. Sanchez*, 450 F.2d 525 (10th Cir. 1971)." 495 F.2d at 681.

This approach was again affirmed in *United States v. Mireles*, 10th Cir. 1978, 583 F.2d 1115, 1117, cert. denied 439 U.S. 936, 99 S.Ct. 332, 58 L.Ed.2d 332.

In light of such authority, the police officers' conduct in making an investigative detention was reasonable since the record discloses ample grounds for their suspicions concerning appellants. Further their conduct was in accord with such a stop. They explained the circumstances to the appellants and asked relatively harmless questions concerning their whereabouts prior to the stop. In the meantime the officers radioed in information to the dispatcher in order to determine if the car they had stopped was the one wanted. Since the police knew the assailants were armed and dangerous, having already killed one individual, it was reasonable to ask any detainees to step out of their car in order for the police to better observe them while awaiting more information from the dispatcher. And finally, asking the appellants if they were armed was surely less intrusive than a frisk which was not done. Though a police officer may be a fool to accept a negative response, since he had authority under *Terry* to conduct a frisk for weapons, surely he has authority to ask. *United States v. Castellana*, 5th Cir. 1974, 500 F.2d 325 (en banc).

We must also consider the constitutional validity of the search of the trunk of Dennis Parkhurst's car. It is well recognized that an individual may waive his/her constitutional right against unreasonable search and seizure by giving a voluntary consent. *Schneckloth v. Bustamonte*, 1973, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854, 859. But this leads to the question of when is a consent voluntary. The Supreme Court grappled with that issue in *Schneckloth*, supra, and established a test for determining when there was a voluntary waiver of Fourth Amendment rights as follows:

" * * * [W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse

consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent. As with police questioning, two competing concerns must be accommodated in determining the meaning of a 'voluntary' consent—the legitimate need for such searches and the equally important requirement of assuring the absence of coercion.

\*　　\*　　\*　　\*　　\*　　\*

" \* \* \* [T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed. In the words of the classic admonition in *Boyd v. United States*, 116 U.S. 616, 635 [6 S.Ct. 524, 534, 29 L.Ed. 746]:

> " 'It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.'

"The problem of reconciling the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official coercion cannot be resolved by any infallible touchstone. To approve such searches without the most careful scrutiny would sanction the possibility of official coercion; to place artificial restrictions upon such searches would jeopardize their basic validity. Just as was true with confessions, the requirement of a 'voluntary' consent reflects a fair accommodation of the constitutional requirements involved. In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. Those searches that are the product of police coercion can thus be filtered out without undermining the continuing validity of consent searches. In sum, there is no reason for us to depart in the area of consent searches, from the traditional definition of 'voluntariness.' " 412 U.S. at 227–229, 93 S.Ct. at 2047–2049, 36 L.Ed.2d at 862–864.

*Schneckloth* was just recently reaffirmed in *United States v. Mendenhall*, 1980, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497.[8]

The question in this case is, therefore, whether Dennis Parkhurst voluntarily consented to the search of his car. If he did, then he would have waived any Fourth Amendment claim of his own. Further, his brother's expectation of privacy as to the car in which he was passenger could not reasonably have been that it would not be searched even if consented to by the owner. Thus a voluntary consent to the search of the car by Dennis, the owner, would also bar Derrick from asserting any Fourth Amendment claim.

---

8. See also, *United States v. White*, 5th Cir. 1980, 617 F.2d 1131; *United States v. Matthews*, 8th Cir. 1979, 603 F.2d 48, cert. denied, 1980, 444 U.S. 1019, 100 S.Ct. 674, 62 L.Ed.2d 650; *Slater v. State*, Fla.1956, 90 So.2d 453; *Longo v. State*, 1946, 157 Fla. 668, 26 So.2d 818; *Strickland v. State*, 1970, 226 Ga. 750, 177 S.E.2d 238; *City of Overland Park v. Sandy*, 1978, 225 Kan. 102, 587 P.2d 883; *People v.*

*Arnold*, 1968, 91 Ill.App.2d 282, 233 N.E.2d 764; *State v. Austin*, 1978, 91 N.M. 793, 581 P.2d 1288; and *State v. Erho*, 1970, 77 Wash.2d 553, 463 P.2d 779.

Upon proper analysis and in the light of the developing law, *Tobin v. State*, 1927, 36 Wyo. 368, 255 P. 788 and *State v. Bonolo*, 1928, 39 Wyo. 299, 270 P. 1065, are in accord.

The issue of the voluntariness of the consent may be properly resolved by a preponderance of the evidence standard. *Fitzgerald v. State*, Wyo.1979, 601 P.2d 1015. On appellate review "we view the evidence most favorably to the party who prevailed below." *Fitzgerald*, supra, 601 P.2d at 1018. Here the evidence was (1) the police officer asked Dennis if he could search the car; (2) Dennis replied he was not a lawyer; (3) Dennis was urged by his brother, Derrick, to go ahead and let the police officer make the search; (4) the officer indicated to Dennis that he did not have to be an attorney, he could consent to the search by himself if he wanted to; and (5) Dennis agreed to permit the search. Based on this evidence the trial court could reasonably have concluded that the defendant voluntarily consented to the search of his automobile. Therefore, we must uphold its decision and rule that the evidence obtained as a result of the search was admissible. The existence and voluntariness of a consent to search is a question of fact to be decided by the trial judge in the light of all attendant circumstances. *Mares v. State*, Wyo.1972, 500 P.2d 530, 534, fn. 1. The trial judge, under the circumstances here, was fully justified in not suppressing evidence acquired by the officers. We find no duress or coercion, as did he.

## II

Appellants' claim also concerns the Fifth Amendment to the United States Constitution and § 11, Art. I of the Wyoming Constitution. The assertion is that the questioning conducted by Officers Hineman and Dekmar following the stop of appellants was unconstitutional since no *Miranda* warnings had been given apprising the appellants of their right to remain silent. Therefore, appellants charge that the trial court erred in not excluding testimony concerning statements made by appellants to the police prior to the giving of *Miranda* warnings, and evidence obtained as a result of the various statements.

Specifically, the following testimony was elicited on direct examination of Officer Hineman involving the conversation he had with the appellants shortly after he stopped their vehicle:

"Q What else did you do then concerning your investigative detention? You testified that both Dennis and Derrick Parkhurst had been asked to exit the car.

"A I asked them where they had been.

"Q And did you get a response?

"A Yes, sir. They said—if I may read from my notes, sir, from my report.

"Q You may look at your notes and refresh your memory.

"A Derrick Parkhurst said they had been north of Glenrock out around the mines just driving.

"Q Did he say anything else as to what they—at that time what they were doing?

"A First he asked what the stop was about. I advised him of the nature of the incident in Glenrock and the possibility that their vehicle matched or partially matched the description of the vehicle seen at or near the scene. I again asked them how they had gotten out there north of Glenrock. Neither one seemed to know.

"Q Derrick Parkhurst told you, though, that they were out around the mines just driving around. Is that what he told you?

"A Yes, sir.

\* \* \* \* \* \*

"Q (by Mr. Laird) What were you doing when you were asking those questions, Deputy Hineman?

"A I was trying to ascertain where they had come from, where they might be going, how they had gotten on to 93, Wyoming 93, how long they had been out there, and what they had been doing while they were out there.

"Q Did anyone have them—you stated you asked a question, had they been to Glenrock. Did you get a response from that question?

"A Yes, sir, Derrick said they had driven through Glenrock."

Also, appellants challenge the admission into evidence of the weapons found in the

trunk of the car on Fifth Amendment grounds because the evidence was discovered as a result of further interrogation by Officer Dekmar. This argument is premised upon the fruit of the poisonous tree doctrine found in *Wong Sun v. United States*, 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441. As to this issue Officer Dekmar testified:

"A Well, after Deputy Hineman had both subjects in front of the vehicle, I determined that there was no longer any possibility of any danger, so I secured my weapon, and—

"Q What do you mean by securing your weapon?

"A I reholstered it.

"Q And then what did you do?

"A I stood up and Deputy Hineman started to walk back to his vehicle, and before I fully approached the subjects, I asked if they had any weapons.

"Q Did you get a response?

"A Yes, I did.

"Q Who did you get a response from?

"A Derrick Parkhurst.

"Q What did he say to you?

"A He said something to the effect that there is a .22 and a shotgun in the trunk."

In the context of the right against self-incrimination involved here, there exist concerns in addition to those found in the search and seizure area. These were discussed in *Michigan v. Tucker*, 1974, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182.

"When involuntary statements or the right against compulsory self-incrimination are involved, a second justification for the exclusionary rule also has been asserted: protection of the courts from reliance on untrustworthy evidence. Cases which involve the Self-Incrimination Clause must, by definition, involve an element of coercion, since the Clause provides only that a person shall not be *compelled* to give evidence against himself. And cases involving statements often depict severe pressures which may

override a particular suspect's insistence on innocence. Fact situations ranging from classical third-degree torture, *Brown v. Mississippi*, 297 U.S. 278 [56 S.Ct. 461, 80 L.Ed. 682] (1936), to prolonged isolation from family or friends in a hostile setting, *Gallegos v. Colorado*, 370 U.S. 49 [82 S.Ct. 1209, 8 L.Ed.2d 325] (1962), or to a simple desire on the part of a physically or mentally exhausted suspect to have a seemingly endless interrogation end, *Watts v. Indiana*, 338 U.S. 49 [69 S.Ct. 1347, 93 L.Ed. 1801] (1949), all might be sufficient to cause a defendant to accuse himself falsely." (Footnote omitted.) (Emphasis in original.) 417 U.S. at 448–449, 94 S.Ct. at 2365–2366, 41 L.Ed.2d at 195–196.

No such pressures were present here. The police were investigating a crime of violence in which the suspects at large posed a serious threat to the public's safety. They contend that they merely stopped the appellants for an investigative detention, as we held in Part I, supra, and that *Miranda* warnings were not necessary until the direction of their detention changed from investigatory to accusatory.

▮▮▮ It is now generally recognized that *Miranda* warnings are not required when police make an investigatory stop pursuant to *Terry v. Ohio*, supra. Absent special circumstances where extraordinary coercive tactics are employed, the warnings are necessary only when the encounter becomes accusatory. Kamisar, Kauper's "Judicial Examination of the Accused" Forty Years Later—Some Comments on a Remarkable Article, 73 Mich.L.Rev. 15, 25, fn. 33 (1975). Thus, since the police had the authority to make the investigatory stop, they were under no duty to give *Miranda* warnings.

▮▮▮ Finally, we observe that appellants' statements themselves were rather innocuous and relatively insignificant. They are neither inculpatory nor exculpatory. But most importantly they, in the context of the right against self-incrimination, do not appear to be the product of coercion.[9] Thus,

---

**9.** Officer Dekmar did testify to having a gun pointed in appellants' direction for a short time.

However he contended that it was only to protect Officer Hineman who was stopping a car

we believe that the statements are not within the scope of the Fifth Amendment prohibition.

### III

 The final issue raised in this appeal concerns the following testimony of Officer Hineman (some of which has previously been set out but, for convenience, is repeated):

"Q What else did you do then concerning your investigative detention? You testified that both Dennis and Derrick Parkhurst had been asked to exit the car.

"A I asked them where they had been.

"Q And did you get a response?

"A Yes, sir. They said—if I may read from my notes, sir, from my report.

"Q You may look at your notes and refresh your memory.

"A Derrick Parkhurst said they had been north of Glenrock out around the mines just driving.

"Q Did he say anything else as to what they—at that time what they were doing?

"A First he asked what the stop was about. I advised him of the nature of the incident in Glenrock and the possibility that their vehicle matched or partially matched the description of the vehicle seen at or near the scene. I again asked them how they had gotten out there north of Glenrock. Neither one seemed to know.

"Q Derrick Parkhurst told you, though, that they were out around the mines just driving around. Is that what he told you?

"A Yes, sir.

"Q After that, what did you do?

"A I continued to talk to the subjects, tried to ascertain or to make certain where they had been, how they had gotten there, what roads they had travelled,

whether they had passed through Glenrock or not. *Some questions were answered, some weren't.*

 * * * * * *

"Q After you returned from the vehicle, from your vehicle and obtained your jacket, what did you do then?

"A Continued to ask them where they had been, where they were going.

"Q After that was there another officer in the area?

"A Officer Dekmar was there with me, yes.

"Q Where was Officer Dekmar during that time?

"A After both of the subjects were out of the vehicle, he had moved over behind me.

"Q At that point in time, did he have his weapon drawn?

"A Not then, no, sir.

"Q What did you do after he moved over to the vehicle?

"A Talked to the subjects where they had been.

 * * * * * *

"Q (by Mr. Laird) Deputy Hineman, what did Officer Dekmar do at the time he came over to the defendants' vehicle?

"A Stood behind me.

"Q Did he [Hineman] make any statements to you?

"A Not at that time, no, sir.

"Q What did the two of you do after the parts you were testifying to?

"A When I returned from the vehicle, the second time, from my vehicle, Officer Dekmar advised that he had asked for consent to search. He advised me this in a loud enough tone of voise [sic] that both subjects could hear him at the front of the vehicle. We were standing about even with the front door, *and neither subject said anything.*" (Emphasis added.)

---

with unknown occupants while searching for armed killers, a most reasonable and acceptable explanation under the circumstances. However Officer Dekmar contends he was concealed from appellants' view. And though Der-

rick Parkhurst testified at a motion hearing that he was able to see the officer and the gun, his testimony was not inconsistent with Officer Dekmar's.

Appellants cite *Clenin v. State*, Wyo.1978, 573 P.2d 844, for the proposition that the officer's remarks were improper comment upon the exercise of their right of silence and that, therefore, their conviction must be overturned. In *Clenin* this court stated:

" * * * We hold that under this section of our state constitution any comment upon an accused's exercise of his right of silence, whether by interrogation of the accused himself, or by interrogation of others inherently is prejudicial, and will entitle an accused to reversal of his conviction. Such a breach of the accused's constitutional protections is plain error and prejudicial per se. * * * " 573 P.2d at 846.

However, we disagree with appellants' position in this case.

While this court said in *Jerskey v. State*, Wyo.1976, 546 P.2d 173, 180, citing and quoting *Miranda v. State of Arizona*, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, with approval, " ' * * * *The prosecution may not, therefore, use at trial the fact that he [defendant] stood mute or claimed his privilege in face of accusation.* * * * ' (With citations) [Emphasis in Jerskey text]," the State did not directly or indirectly use a reference to silence against the appellants in the case now before the court.

Preceding *Clenin v. State*, supra, was *Irvin v. State*, Wyo.1977, 560 P.2d 372, which first introduced into the jurisprudence of Wyoming the rule of *Doyle v. Ohio*, 1976, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, the root case out of which grew not only *Irvin* but also *Clenin*. The rule of *Doyle* is that:

" * * * [U]se for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment. The State has not claimed that such use in the circumstances of this case might have been harmless error. * * * "

In neither *Irvin v. State*, supra, nor in *Clenin v. State*, supra, did this court prohibit all references to silence nor dictate unnecessary invocation of the stern rule of *Clenin*. Application of the rule must be made on a case-to-case basis. In *Clenin* it may appear without close examination that any statement having reference to silence of the defendant amounts to an absolute prohibition because he cannot be "compelled in any criminal case to be a witness against himself" within the protection of the Fifth Amendment to the United States Constitution and ";compelled to testify against himself in any criminal case" within the language of § 11, Art. I of the Wyoming Constitution. We must look at the two cases of *Irvin* and *Clenin*. Both were squarely within *Doyle* because they were clear attempts to impeach the defendants because they had failed to tell law enforcement officers that they had alibis which at trial were for the first time raised as defenses. The use of defendant's silence in each case amounted to indirectly compelling him to testify. Without so deciding, we can say that any defense raised by the defendant at trial for the first time without previous advice to the State would probably fall within the same category. *Clenin* and *Irvin* are, therefore, clearly distinguishable from the case before us.

*Gabrielson v. State*, Wyo.1973, 510 P.2d 534, furnishes another example wherein use of defendant's silence is an applicable ground upon which to reverse. There an officer testified that the defendant had refused to give him a statement. Here failures to speak did not "compel" the defendants to testify against themselves nor does there appear even an innuendo that the appellants were even unconsciously making any claim of right to silence in their unresponsiveness. No element of coercion is present nor can any inferences of guilt whatsoever be drawn from the absence of responses by the appellants.

Further, in *Jerskey v. State*, supra, 546 P.2d at 183, the court approved the principle that forbidden statements are reversible error where the prosecution has used a defendant's silence as a means of creating an inference of guilt; nor can there here be any inference "that an honest answer would have established the appellant's guilt," *Jerskey* at page 183. The conclusion must be that the testimony of the officer with re-

spect to the challenged statements simply does not rise to the level of prohibited comments on silence. When silence carries no penalty, there is no error. *Irvin v. State,* supra at 373.

We believe that it is consistent with *Jerskey* and *Clenin* to read the term "comment" as implying more than a reference to the accused's silence. Implicit in the term is a reaction to that which is being mentioned which would present the possibility of the State exploiting the silence. Here the officer's statements were: "Some questions were answered, some weren't" and "neither subject said anything." Those statements constituted the totality of any reference to silence. These isolated statements were never at any time intended to be used to the prosecutor's advantage by the prosecution. Further, no later reference was made to any of them. There is nothing derogatory in those words; there is no expression of the police officer's attitude towards such silence. They are not so much statements concerning appellants' silence as they are testimony about behavior. Moreover, the silence referred to was of a passive nature; there was no affirmative exercise of the right to silence. Without more there is no reason to infer that the jury read the appellants' silence as an admission of guilt. It is reasonable to conclude that the jury took the appellants' unresponsiveness within the complete context of the stop as an indication that the appellants did not hear the question, the officer asked the question too fast, or they were frightened or confused—a state shared by most people upon being stopped by the police even though guiltless. There is nothing in these circumstances to indicate that appellants' nonresponsiveness manifests an exercise of their right of silence.

The present case is a far cry from *Doyle, Irvin* or *Clenin.* We do not believe it is this type of situation that was envisioned by the court in *Clenin* as constituting "comment." Merely observing that the defendants had not said much is not comment. Thus, without some showing of prejudice there is no error. The trial judge was in a better position to gauge what, if any, impact such statements had on the jury, and if

the defendants' silence was used against them. Absent a showing of prejudice and where the statement is not a comment upon an appellant's silence, but merely a reference to it, we will not reverse.

Accordingly, the judgment is affirmed.

ROSE, Chief Justice, specially concurring.

I concur in the results reached by the majority but do so according to the following reasoning and under the authorities cited herein.

The facts necessary to my decision are these:

In connection with a murder investigation, Officer Hineman stopped the Parkhursts' car by the roadside. Officer Dekmar arrived immediately, drew his pistol, and aimed it at the Parkhursts. Hineman ordered the two subjects out of their car and to the front of it, where he questioned them concerning their recent whereabouts. Dekmar holstered his gun and walked over to the car area. On questioning, Derrick Parkhurst revealed that there was a .22 and a shotgun in the trunk of the car. The officers obtained permission to retrieve the weapons, and, after determining that the shotgun had been recently fired, placed both subjects under arrest.

Issues considered:

1. Whether the "stop" was actually an arrest or an unreasonable police action;

2. Whether the consent to search was legitimate;

3. Whether *Miranda* warnings were needed prior to the formal arrest; and

4. Whether testimony referring to the accuseds' failure to answer prearrest questions violating their right to silence.

I agree with the majority opinion that none of the above points presents any grounds for reversal. The following discussion goes into my reasons for agreement, but points out areas where contrary conclusions are plausible.

## 1. WHETHER THE "STOP" WAS ACTUALLY AN ARREST OR AN UNREASONABLE POLICE ACTION.

The majority assumes that up until the formal arrest the police confrontation constituted the kind of investigation detention allowable without the probable cause requirements of a full-blown arrest. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), talks about the factors which authorize this kind of detention, and also about the scope of permissible intrusion upon an individual's privacy, calling for a balance between the degree of intrusion and the need to detain or search. *Terry*, supra, 392 U.S. at 21, 88 S.Ct. at 1879. The need to detain or search breaks down into two parts: (1) facts giving rise to "articulable suspicions," *Terry*, supra, 392 U.S. at 21–22, 88 S.Ct. at 1879–80; and (2) the policeman's interest in self-protection. *Terry*, supra, 392 U.S. at 23–24, 88 S.Ct. at 1881. In the present case, the majority found the police conduct reasonable and allowable in light of the above factors. I agree with the result for the following reasons: (a) *Terry* dealt with a prospective crime and an officer's observance of suspicious behavior; in the present case the grounds for suspicion are stronger because the officers knew a crime had already been committed and had at least a minimal description of the suspects and their apparent locality; (b) the concern for protection of the officers is at least as great here as it was in *Terry*, since, as the majority points out, the police "knew" that the criminals they sought were armed and dangerous; and (c) the intrusion was minimal. However, this point is arguable, as discussed below.

It seems that to the extent Officers Hineman and Dekmar merely stopped the appellants' car and ordered them outside for questioning, their conduct was completely reasonable. It constituted less of an invasion of privacy than the "frisk" in *Terry*. However, by wielding his gun, Dekmar added an element of coercion to the initial encounter which opens grounds for argument to the effect that the police behavior was either unreasonably intrusive or was an arrest.[1]

An arrest, as defined in *Rodarte v. City of Riverton*, Wyo., 552 P.2d 1245 (1976), occurs when an officer subjects a person to "some kind of control and detention amounting to a restriction upon his or her freedom," but "[e]xcepting * * * where the officer temporarily detains for investigation." *Rodarte*, supra, 552 P.2d at 1251. The accompanying discussion in *Rodarte* leaves room for further inquiry into the question of when a policeman has merely "temporarily detained" someone.

Some courts have held that the detention of a person at gunpoint amounted to an arrest. This holding follows from the notion that an arrest occurs when police have effectively restrained a person's liberty of movement. See, *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). When an officer points a gun at someone, he at least constructively restrains them. However, in light of *Terry*, this kind of absolute definition of an arrest becomes enigmatic and does not make much sense. Even an investigative stop contemplates enforced compliance, so that the subject really is not free to go. Otherwise, there would be little substance to the idea of investigative detention.

In any event, the cases employing this restraint argument are all distinguishable from the present case. In some cases, the police behavior was plainly excessive. See, e. g., *State v. Werth*, 18 Wash.App. 530, 571 P.2d 941 (1977) (police looking for escaped inmate, surrounded subject's house, ordered her outside where she saw officer with shotgun, conducted warrantless search of house); *Burns v. State*, Okl., 595 P.2d 801 (1979) (officer pulled car over to investigate in connection with an attempted armed robbery, because he had not seen the car in the locality before; ordered driver out of car at gunpoint). In others, probable cause or even a warrant already existed. See e. g.,

---

1. I don't think the distinction makes a whole lot of difference, except that if you call it an arrest, a discussion of probable cause must follow.

*United States v. Hensley,* 374 F.2d 341 (5th Cir. 1967), cert. denied 388 U.S. 923, 87 S.Ct. 2139, 18 L.Ed.2d 1373, reh. denied 389 U.S. 891, 88 S.Ct. 25, 19 L.Ed.2d 210, (arrest occurred when detectives ordered suspect out of his car and into their car at gunpoint; court found probable cause in connection with immediately preceding attempted bombing); *United States v. Lampkin,* 464 F.2d 1093 (3rd Cir. 1972) (arrest when officers approached with guns drawn and asked for identification; outstanding warrant for subject's arrest). Finally, some cases involved circumstances not suggesting fears for the officers' safety. See, e. g., *United States v. Strickler,* 490 F.2d 378 (9th Cir. 1974) (suspected dope deal; arrest occurred when police cars surrounded the suspect car and one officer aimed a gun at the occupants); *United States v. Ramos-Zaraqosa,* 516 F.2d 141 (9th Cir. 1975) (arrest completed when occupants of car got out at order and gunpoint; suspected of transporting heroin). While any of these factors might lend weight to the conclusion that an arrest took place, none is present in our case.

On the other hand there is abundant authority for the proposition that a policeman may point his weapon at the subject of an investigative stop without transforming the stop into an arrest or triggering the probable-cause requirements. See, e. g., *United States v. Balsamo,* 468 F.Supp. 1363 (D.Me. 1979); *United States v. Diggs,* 522 F.2d 1310 (D.C. Cir. 1975), cert. denied 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976); *United States v. Richards,* 500 F.2d 1025 (9th Cir. 1974), cert. denied 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393; *State v. Goudy,* 52 Hawaii 497, 479 P.2d 800 (1971). The cases I have found on this point all use the rationale alluded to in the majority opinion which is to the effect that, in a potentially dangerous situation, a policeman may reasonably draw his weapon for self-protection. I have not found any cases authorizing drawn weapons in the course of investigative stops where the police lacked any reasonable grounds to fear death or serious injury. However, I think the present case falls well within this limitation.[2]

It is sound policy that police, who have a duty to investigate crime, should be permitted to take steps to minimize the risks of bodily harm. In this case Dekmar kept his gun out only long enough to determine that there was no immediate threat. Thus, I agree with the majority holding that the police conduct was reasonable, and an arrest was not effected thereby.

## 2. WHETHER THE CONSENT TO SEARCH WAS LEGITIMATE.

The legality of a search by consent boils down to two questions: (a) whether the consent is tainted by prior illegality; and (b) whether the consent was voluntary. In the case before this court, the question of prior illegality is the same question as that which has been discussed above—namely—whether or not the police unreasonably detained or illegally arrested the Parkhursts. If they did, the prevailing view is that the consent and the resulting discoveries are all "fruits of the poisonous tree" and cannot be relied upon to sustain the judgment. *People v. Haven,* 59 Cal.2d 713, 31 Cal.Rptr. 47, 381 P.2d 927 (1963); *State v. Kennedy,* 45 Or.App. 911, 609 P.2d 438 (1980) (unjustified "stop" tainted consent to search, so resulting evidence must be suppressed); see *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).[3]

---

**2.** It is arguable that at the point of initial encounter Dekmar did not have sufficient cause to pull his gun because he did not have sufficient reason to believe that these suspects were indeed the armed killers. This is a fine line to draw, but see *Burns v. State,* supra, where the court found an arrest.

**3.** There is an exception to this rule where the search is so distinguishable from the prior illegality as to be cleansed of the primary taint. *State v. Kelgard,* 40 Or.App. 205, 594 P.2d 1271 (1979) (whether consent to search is inextrica-

bly bound to prior illegal search or seizure depends on proximity in time or space); see *Wong Sun v. United States,* supra, 371 U.S. at 487–488, 83 S.Ct. at 417.

Some courts have regarded the voluntariness of the consent to search as a distinguishing factor sufficient to "purge the taint." This approach in effect ignores the "fruit of the poisonous tree" doctrine and concentrates entirely on the voluntariness issue. See, e. g., *State v. Petersen,* 124 Ariz. 336, 604 P.2d 267 (1979) · (even after unlawful arrest, search of car is

In my judgment the majority opinion reaches the proper result in the voluntariness issue. I do not see any question but that the owner of the car, Dennis Parkhurst, voluntarily consented to the search under the standard set by the Supreme Court in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Portions of the record indicate that before the officers gained permission to look in the trunk, they had already apprised the Parkhursts of the nature of the investigation, and Dekmar had put away his pistol. They had also told Dennis that he could refuse.[4]

All of these factors support the trial judge's finding that the officers obtained a legitimate consent before searching.

As to the effectiveness of Dennis' consent to bind Derrick, the majority opinion reasons that a passenger could not reasonably have any greater expectation of privacy than that the car would be searched if consented to by the owner. The cases I have found all reach the same result, though generally under the rationale that the passenger does not have the authority to grant or to deny permission, so his consent is not needed to authorize the search. See *Sergent v. People*, 177 Colo. 354, 497 P.2d 983 (1972); *State v. Gaines*, 6 Ariz. App. 561, 435 P.2d 68 (1967); *State v. Springer*, 102 Ariz. 238, 428 P.2d 95 (1967), cert. denied 390 U.S. 926, 88 S.Ct. 859, 19 L.Ed.2d 986 (1968).

### 3. WHETHER *MIRANDA* WARNINGS WERE NEEDED PRIOR TO THE FORMAL ARREST.

*Miranda* warnings are required only in circumstances of "custodial interrogation." *Sanville v. State*, Wyo., 553 P.2d 1386 (1976). In *Sanville*, this court adopted the following definition from *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966):

> "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, supra, 384 U.S. at 444, 86 S.Ct. at 1612.

In part 1 of this concurring opinion, I addressed the question of whether Dennis and Derrick Parkhurst were arrested at the outset of their encounter with the police. Concerning the need for *Miranda* warnings, four possibilities flow from that discussion:

1. The Parkhursts were initially arrested without probable cause.[5] Lack of *Miranda* warnings would require exclusion of evidence,[6] because they were "taken into custody."

2. They were arrested with probable cause. The failure to give *Miranda* warnings would still give rise to the exclusion of at least some evidence.[7]

3. They were unreasonably detained by the officers. If so, they were probably "de-

---

okay if consent given, but places voluntariness under heavy scrutiny); *United States v. Bazinet*, 462 F.2d 982 (8th Cir. 1972), cert. denied 409 U.S. 1010, 93 S.Ct. 453, 34 L.Ed.2d 303. Assuming arguendo that we have an illegal arrest or stop in our present case, I do not think there are sufficient time or space factors to bring it under the exception, unless we adopt the voluntariness approach just mentioned. I do not recommend this approach because it confuses the issues and relaxes the "poisonous fruit" doctrine too much.

4. I doubt that telling Dennis he could consent or refuse, without more, amounts to informing him of his rights in the matter; however, the Supreme Court in *Schneckloth* emphasized that voluntariness does not depend on knowledge of the right to refuse. 412 U.S. at 227, 229–230, 93 S.Ct. at 2047, 2048–49. Further,

barring "inherently coercive tactics," voluntariness does not depend on the presence or absence of *Miranda* warnings. 412 U.S. at 247, 93 S.Ct. at 2058.

5. Because I do not think there was an arrest, I do not reach the probable-cause issue in this opinion.

6. Probably this would be only relevant to exclude testimonial evidence in case the "fruit of the poisonous tree" doctrine was held inapplicable. Otherwise the "poisonous tree" doctrine would independently require the exclusion of this evidence, rendering moot the *Miranda* question.

7. The scope of exclusion under *Miranda* is discussed in greater detail in the text of this concurring opinion.

prived of [their] freedom in [a] significant way," so the failure to give *Miranda* warnings would require the exclusion of some evidence.[8]

4. They were legitimately detained for questioning. *Miranda* may still apply, if the detention was "custodial" within the definition given above, i. e., if the Parkhursts were significantly deprived of their freedom.

This last possibility follows most logically from the discussion in part 1, and thus poses the question of whether the detention was "custodial," as distinguished from the question which asks whether it was "an arrest."

As noted in *Sanville*, supra, 553 P.2d at 1388, the *Miranda* rules ordinarily do not affect general on-the-scene questioning or other steps in the general fact-finding process. And, accordingly, they generally do not affect investigative stops outside the stationhouse. See, e. g., *Allen v. U. S.*, 390 F.2d 476 (D.C. Cir. 1968); *U. S. v. Gallagher*, 430 F.2d 1222 (7th Cir. 1970), cert. denied 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264; *People v. Rodney P.*, 21 N.Y.2d 1, 233 N.E.2d 255 (1967). On the other hand, the *Miranda* definition cited in *Sanville* certainly implies that detention need not reach the level of arrest before it becomes "custodial." See *U. S. v. Thevis*, 469 F.Supp. 490, 506 (D.C.Conn.1979), aff'd, 614 F.2d 1293 (2nd Cir. 1979), cert. denied 446 U.S. 908, 100 S.Ct. 1834, 64 L.Ed.2d 260 (1980). The question then is what factors differentiate a noncustodial stop from a custodial stop requiring *Miranda* warnings. The usual approach to this question seems to be one which uses an objective, reasonable-man kind of standard to determine whether the

subject's liberty was significantly attenuated. The test is whether, considering all relevant circumstances, a person might reasonably believe that he was not free to leave. *United States v. Kennedy*, 573 F.2d 657 (9th Cir. 1978). Relevant circumstances include the number of officers involved in the stop, and the length of questioning. *United States v. Kennedy*, supra. Whether or not the officers would have stopped the subject from leaving is, under this view, less important than whether or not they have communicated the fact to him. *State v. Ferrell*, 41 Or.App. 51, 596 P.2d 1011 (1979).[9]

The facts of this present case leave room for argument as to whether or not a custodial stop occurred initially. Again, the argument revolves around Dekmar's use of the gun. If Dekmar had held the Parkhursts at gunpoint throughout the length of the interview, I would want to call it a custodial situation requiring *Miranda* warnings. This was the holding in *United States v. Balsamo*, 468 F.Supp. 1363, 1385–1386 (D.Me.1979), where the court found that even though the stop was not an arrest, *Miranda* warnings were required. The continued presence of the gun would then provide the kind of coerciveness which is incident to a stationhouse interrogation, and to which *Miranda* was primarily addressed. However, under the facts of the case at bar, the use of the gun was temporary and of short duration. This and other factors lead me to the conclusion that an ordinary person under the circumstances would think that he/she was free to leave, or at least would be free to do so after a short period of detention.[10] First, the officer who ap-

8. See n. 6 and n. 7, supra.

9. In *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), four officers arrived at the suspect's boarding house at four a. m. and questioned him in his bedroom. The United States Supreme Court held this to be custodial interrogation because the officers testified that the subject was not free to go and was "under arrest." If this indicates a test based on the subjective state of the officers, the test has apparently been seldom used; I have found no cases using it. I think the difficulties involved in proving the officers' objective state

make the test relatively impractical. In any event, the present case is distinguishable from *Orozco* because the officers there thought they were arresting the subject, not merely detaining him.

10. To read the test as requiring *Miranda* warnings for even the most temporary of forcible detentions would go too far. Recall that the thrust of the test is whether the subject has been "deprived of his freedom of action in any *significant* way." (Emphasis added.) *Miranda*, supra 384 U.S. at 444, 86 S.Ct. at 1612.

proached (Hineman) did not display his weapon. Second, he promptly indicated to the subjects that he was investigating the *possibility* that their car matched the description of a car at the crime scene. Third, there is no indication that the questioning period preceding the formal arrest was unreasonably lengthy. Finally, the fact that Dekmar reholstered his gun before walking over confirmed the fact that the questioning was, at that juncture, still only investigative. For these reasons I do not think that the prearrest questioning of the Parkhursts constituted "custodial interrogation" within the meaning of *Miranda*.

Assuming, however, that a custodial interrogation *did* take place, there remain two important questions regarding the exclusion of evidence under the *Miranda* rule:

1. Whether the "fruit of the poisonous tree" doctrine operates to exclude evidence found subsequent to a *Miranda* violation.

2. Whether consent to search, given while in custody, is valid in the absence of *Miranda* warnings.

In general the doctrine of the "fruit of the poisonous tree" has been applied only in the context of Fourth Amendment violations. While I have found a few cases applying it to *Miranda* violations,[11] I doubt the soundness of these decisions.[12] I would therefore conclude that the argument that *Miranda* violations in the instant matter would require suppression of material evidence is without merit.

11. See *United States v. Cassell*, 452 F.2d 533 (7th Cir. 1971); *Commonwealth v. Meehan*, Mass., 387 N.E.2d 527 (1979); *State v. Preston*, Me., 411 A.2d 402 (1980) (the court reasoned that the deterrence in excluding statements made in violation of *Miranda* would be undercut if material evidence obtained as a result was admissible).

12. The United States Supreme Court withheld judgment on this issue in *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). However, the privilege against self-incrimination has generally been held to apply only to testimonial evidence. See *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

13. With regard to Fifth Amendment violations, the Wyoming Supreme Court has employed a harmless-error rule. See *Moss v. State*, Wyo.,

Finally, the great majority of courts have held that a consent to search given even while in custody is not invalid for lack of *Miranda* warnings, because "a consent to search, as such, is neither testimonial nor communicative of the Fifth Amendment sense." *People v. Thomas*, 12 Cal.App.3d 1102, 91 Cal.Rptr. 867, 872 (1970); see *Phillips v. People*, 170 Colo. 520, 462 P.2d 594 (1969); *State v. Oldham*, 92 Idaho 124, 132, 438 P.2d 275, 283 (1968); *State v. Stein*, 203 Kan. 638, 639–640, 456 P.2d 1, 2–3 (1969), cert. denied 397 U.S. 947, 90 S.Ct. 966, 25 L.Ed.2d 120 (1970). Contra, *State v. Williams*, 248 Or. 85, 432 P.2d 679 (1967) (a request to search is a request that defendant be a witness against himself). In this view, assuming the Parkhursts were in custody, the officers' failure to give *Miranda* warnings would not require suppression of the material evidence discovered pursuant to consent, even if it required suppression of the testimonial evidence.[13]

4. WHETHER TESTIMONY REFERRING TO THE ACCUSEDS' FAILURE TO ANSWER PREARREST QUESTIONS VIOLATED THEIR RIGHT TO SILENCE.

Part III of the majority opinion concerns this issue, with reference to the Fifth Amendment of the United States Constitution and, more particularly, Art. I, § 11 of the Wyoming Constitution. The question turns on the rule stated in *Clenin v. State*, Wyo., 573 P.2d 844 (1978):

492 P.2d 1329, 1333 (1972) (held not reversible error where the incorrectly admitted testimony was not possibly damaging or incriminating); *Jerskey v. State*, Wyo., 546 P.2d 173, 182 (1976) (adopts the standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), that an error may be considered harmless only if it can be shown beyond a reasonable doubt that it was harmless and did not contribute to the conviction).

In the present case, assuming that there was a *Miranda* violation, admission of the testimonial evidence would seem to constitute harmless error because of the innocuous nature of the questions asked and the answers received. This is, however, subject to two possible exceptions: (1) the consent to search; and (2) the comments on the subjects' silence.

" * * * We hold that under this section of our state constitution any comment upon an accused's exercise of his right of silence, whether by interrogation of the accused himself, or by interrogation of others inherently is prejudicial, and will entitle an accused to reversal of his conviction. Such a breach of the accused's constitutional protections is plain error and prejudicial per se." *Clenin*, supra, 573 P.2d at 846.[14]

In an apparent effort to temper the absoluteness of the rule as stated in *Clenin*, the majority analyzes it as follows:

1. The term "comment," as used in the *Clenin* rule, means more than an innocent reference to the accused's silence; it implies a possibility of the state exploiting the reference;

2. A mere reference to the accused's silence will not call for reversal, absent a showing of prejudice.

· I agree with the majority on both points, by way of the following line of reasoning. The reason for a rule of automatic reversal is deterrence; if the court decided case by case whether there was prejudice in commenting on an accused's silence, the prosecution might be tempted to make more such comments, hoping they would pass as nonprejudicial. On the other hand, where the prosecution has made an innocent or inadvertent reference to the accused's silence, without using it or intending to use it in any way to the state's advantage, the rule of automatic reversal would have little or no deterrent effect. In such a case, a rule of harmless error would be more suitable, in light of the societal interest in upholding convictions where no prejudicial error has occurred.

Given that the material evidence was admissible on other grounds, and given that the victim's wife, Christina Baird, identified Derrick Parkhurst at trial, I am comfortable with the majority's conclusion that the testimonial references to the defendants' silence were nonprejudicial.

I agree with the result in part III of the opinion on additional grounds, also. In the words of the majority opinion,

"[h]ere, failures to speak did not 'compel' the defendants to testify against themselves nor does there appear even an innuendo that the appellants were even unconsciously making any claim of right to silence in their unresponsiveness." 628 P.2d at 1381.

Here the majority raises, though it does not answer, the question of what constitutes an accused's "exercise of his right to silence." It is my judgment that the exercise of the right to silence as a constitutional privilege arises only in the context of "custodial interrogation." This view finds support in *Abeyta v. State*, Wyo., 592 P.2d 705 (1979), where the Wyoming Supreme Court said of *Clenin* and its supporting cases [15]:

"These cases all involve factual situations where custodial interrogation makes applicable Art. I, § 11, Wyoming Constitution, and the Fifth Amendment to the Constitution of the United States, and their prohibitions against self-incrimination to those cases, and the rule identified in *Clenin* is proper to apply under those factual situations." *Abeyta*, supra, 592 P.2d at 707.

The court in *Abeyta* held that the *Clenin* rule did not apply where the silence commented upon was not a response to a law enforcement agent. I see no reason to distinguish a factual setting in which the silence was a precustodial response to a police officer. Of course, reference to the silence may be prejudicial in that it may create inferences, but this is true whether the response referred to was to a law enforcement agent or to any third party. Only when an officer's questioning becomes coercive does it differ from the questioning of a nonofficer, in this context. The point where coerciveness arises should correspond

---

14. This is clearly a broader rule than what would be required under the United States Constitution alone. See *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980).

15. These are the same cases relied upon in part III of the majority opinion: *Clenin v. State*, supra; *Jerskey v. State*, supra; *Irvin v. State*, Wyo., 560 P.2d 372 (1977); *Gabrielson v. State*, Wyo., 510 P.2d 534 (1973); *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

to the point when *Miranda* warnings become imperative; that is, when the interrogation has become "custodial," as discussed in the text above. To hold otherwise would produce the questionable result that prior to "custody," the subject's silences are protected, yet he is not entitled to a warning that his statements may be used against him. Further, it is at least arguable that silence prior to *Miranda* warnings is less consistent with innocence than silence after the warnings have been given, and thus has greater probative value.[16]

For the reasons given, I would have affirmed and I do concur with the majority opinion.

16. This is, however, an evidentiary and not a constitutional argument.